NATIONAL VETERANS LEGAL SERVICES PROGRAM
Barton F. Stichman (DC SB 218834, *pro hac vice*)
Renee A. Burbank (CT SB 440300, *pro hac vice application forthcoming*)
1100 Wilson Blvd.
Suite 900
Arlington, VA 22209
Tel: 202-265-8305
Email: bart@nvlsp.org
        Renee.burbank@nvlsp.org

SIDLEY AUSTIN LLP
Sean A. Commons (SBN 217603)
Caleb J. Bowers (SBN 332189)
Brooklyn Hildebrandt (SBN 350707)
350 South Grand Avenue,
Los Angeles, California 90071
Tel: 213-896-6000
Email: scommons@sidley.com
        cbowers@sidley.com
        bhildebrandt@sidley.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEVERLY NEHMER, et al., | Case No.  3:86-cv-06160 (WHA) |
| Plaintiffs, | **NOTICE OF MOTION AND MOTION FOR CY PRES DISTRIBUTION OF RESIDUE FUNDS; MEMORANDUM OF POINTS AND AUTHORITIES; REQUEST FOR JUDICIAL NOTICE; [PROPOSED] ORDER** |
| v. | |
| UNITED STATES DEPARTMENT OF VETERANS AFFAIRS, et. al., | Complaint Filed:        October 31, 1986 |
| Defendants. | Date:    September 26, 2024 |
| | Time:  8:00 a.m. |
| | Place:  Courtroom 12, 19th Floor |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ............................................................................... 1

STATEMENT OF RELIEF REQUESTED ........................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES .................................................... 2

I.     INTRODUCTION ................................................................................................ 2

II.    STATEMENT OF FACTS RELEVANT TO THE MOTION ............................... 3

    A.  The Statute Upon Which This Lawsuit Was Based—The Veterans' Dioxin and
Radiation Exposure Compensation Standards Act of 1984 ................................... 3

    B.  The Court Certifies this Case as a Class Action and Invalidates VA's Agent Orange
Compensation Regulation ...................................................................................... 4

    C.  The Agent Orange Act of 1991 ............................................................................. 4

    D.  The Judicially Enforceable Consent Decree ......................................................... 5

    E.  The Retroactive Compensation Owed Pursuant to the Consent Decree ............... 5

    F.  Locating Payees Owed Retroactive Compensation Pursuant to the Consent Decree ......... 6

    G.  Unclaimed Funds Pursuant to the Consent Decree .............................................. 9

III.   ARGUMENT ...................................................................................................... 10

    A.  This Court Has Authority to Order the Disposition of the Unclaimed Funds ......... 10

    B.  This Court Should Award a Cy Pres Distribution of the Unclaimed Funds For the
Express Benefit of Class Members and Surviving Family Members ..................... 11

        1.  Cy Pres Distribution to the Legal Services Corporation Would Further the
Objectives of the Underlying Statute ........................................................... 12

        2.  Cy Pres Distribution to the Legal Services Corporation Targets the Plaintiff Class ... 13

        3.  Cy Pres Distribution to Legal Services Corporation Provides Reasonable
Certainty That Class Members Will be Benefited .......................................... 15

    C.  Reversion of the Unclaimed Funds to Defendants Is Not an Option and Would
Inequitably Benefit the Wrongdoer ...................................................................... 16

    D.  Escheat to the Government is Disfavored and Would Inequitably Benefit the
Wrongdoer ........................................................................................................... 19

APPENDIX A ........................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cushman v. Shinseki,*
    576 F.3d 1290 ...........................................................................................................10

*Dennis v. Kellogg Co.,*
    697 F.3d 858 (9th Cir. 2012) ..................................................................................12

*Haddock v. United States,*
    135 Fed. Cl. 82 (2017) ...........................................................................................7, 8

*Holtzman v. Turza,*
    828 F.3d 606 (7th Cir. 2016) ..................................................................................16

*Joffe v. Google, Inc. (In re Google Inc. St. View Elec. Commc'ns Litig.),*
    21 F.4th 1102 (9th Cir. 2021) ...........................................................................10, 16

*Klier v. Elf Atochem N. Am., Inc.,*
    658 F.3d 468 (5th Cir. 2011) .............................................................................10, 11

*Koby v. ARS Nat'l Servs., Inc.,*
    846 F.3d 1071 (9th Cir. 2017) ................................................................................12

*In re Lupron,*
    677 F.3d 21 (1st Cir. 2012)................................................................................11, 16

*Nachshin v. AOL, LLC,*
    663 F.3d 1034 (9th Cir. 2011) ................................................................................12

*Nehmer v. U.S. Department of Veterans Affairs,*
    494 F.3d 846 (9th Cir. 2007) .............................................................................17, 18

*Nehmer v. United States Dep't of Veteran Affairs,*
    2020 U.S. Dist. LEXIS 207458, 2020 WL 6508529 (N.D. Cal. Nov. 5, 2020) ................5, 16

*Nehmer v. United States Veterans' Admin.,*
    118 F.R.D. 113 (N.D. Cal. 1987)........................................................................4, 15

*Nehmer v. United States Veterans' Admin.,*
    32 F. Supp. 2d 1175 (N.D. Cal. 1999) ................................................................6, 17

*Nehmer v. United States Veterans' Admin.,*
    712 F. Supp. 1404 (N.D. Cal. 1989) ...............................................................3, 4, 12

*Nehmer v. Veterans' Admin.*,
    284 F.3d 1158 (9th Cir. 2002) ......................................................................7, 17

*Physician Healthsource, Inc. v. A-S Medication Sols., LLC*,
    No. 12 C 5105, 2020 WL 3087070 (N.D. Ill. June 8, 2020) ...................................17

*Procopio v. Wilkie*,
    913 F.3d 1371 ........................................................................................................19

*Six (6) Mexican Workers v. Ariz. Citrus Growers*,
    904 F.2d 1301 (9th Cir. 1990) ......................................................11, 12, 16, 20

*In re Wells Fargo Sec. Litig.*,
    991 F. Supp. 1193 (N.D. Cal. 1998) ......................................................................11

**Statutes**

28 U.S.C. § 2041 ...........................................................................................................20

38 U.S.C. § 1116 ..................................................................................................4, 5, 16

Veterans' Dioxin and Radiation Exposure Compensation Standards Act of 1984,
    Pub.L. 98–542, 98 Stat 2725 ...................................................................................3

Veterans' Dioxin and Radiation Exposure Compensation Standards Act, Pub. L. 98-
    542 ............................................................................................................................15

**Other Authorities**

38 C.F.R. § 3.307(a)(6)(ii) (1997) .................................................................................6

38 C.F.R. § 3.307(a)(6)(iii) (2023) ..............................................................................16

38 C.F.R. § 3.309(e) .......................................................................................................8

38 C.F.R. § 3.311a(d)(1986) ..........................................................................................3

38 C.F.R. § 3.816(f) ........................................................................................................7

59 Fed. Reg. 5, 106 (Feb. 3, 1994) ................................................................................6

59 Fed. Reg. 29, 723 (June 9, 1994) ..............................................................................6

61 Fed. Reg. 57, 586 (Nov. 7, 1996) ..............................................................................6

Legal Services Corporation, LSC Veterans Task Force (last visited 7/25/2024),
    *available at* https://www.lsc.gov/initiatives/lsc-task-forces/lsc-veterans-task-force ..............14

Legal Services Corporation, Who We Are (last visited 7/25/2024),
    https://www.lsc.gov/about-lsc/who-we-are ...........................................................13

LSC 2021 Report of the Veterans Task Force (last visited 7/25/2024), *available at*
     https://lsc-live.app.box.com/s/buoeznt4t7284462luqxcvqg1p1lnatu......................................14

NEWBERG ON CLASS ACTIONS § 10.15 (4th ed. 2002) ..................................................................11

**MOTION FOR CY PRES DISTRIBUTION**

CASE NO. 3:86-CV-06160 (WHA)

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that Plaintiff Beverly Nehmer and the plaintiff class ("Plaintiffs") hereby move pursuant to the Court's inherent equitable powers to order that unclaimed class action funds be directed, on a *cy pres* basis, to a worthy alternate use.  This motion will be heard at 8:00 a.m. on September 26, 2024, before the Honorable William H. Alsup, United States District Judge, in Courtroom 12 on the 19th Floor of the U.S. Courthouse, located at 450 Golden Gate Avenue, San Francisco, California.  This motion is based on this notice of motion and motion, the memorandum of points and authorities along with other supporting documentation (including declarations), the pleadings, the arguments of the parties, and other material as may be considered by the Court.

## STATEMENT OF RELIEF REQUESTED

Plaintiffs ask the Court to grant the motion and to order that the unclaimed class funds owed by defendant U.S. Department of Veterans Affairs (VA) to members of the certified plaintiff class pursuant to the Final Stipulation and Order ("Consent Decree"), as adopted, modified and approved by this Court, ECF Dkt No. 141, be distributed as a *cy pres* award to the Legal Services Corporation ("LSC")—a national, independent 501(c)(3) nonprofit corporation that is best positioned to distribute funding to nonprofit organizations across the country—to fund grants to other non-profit organizations through a competitive process, which grants would be used to perform specified services, without cost, that are known to benefit individual class members and certain of their surviving family members.

Plaintiffs request that the Court make the *cy pres* distribution in the amount of class funds currently owed by the VA that are demonstrably unclaimed for certain class members based on the existing evidence.  Plaintiffs request the installment in the amount of the funds for which (a) no appropriate payee currently exists or (b) an appropriate payee may exist but cannot be located by the parties despite their diligent efforts to locate one.  To be explicit, this motion is only with respect to class funds currently owed by the VA that are demonstrably unclaimed as of the date of this motion. Plaintiffs reserve the right to make a separate request for funds later identified to be unclaimed.[1]

_____

[1] Plaintiffs believe a future distribution will be warranted in the amount of any class funds owed by the VA for an additional group of class members, where funds are owed to those members but the

### MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Since 1986, Plaintiffs have engaged this Court to require the VA to comply with its legal obligations to Vietnam veterans who faced exposure to Agent Orange, and their surviving family members.  In this latest chapter, Plaintiffs engage this Court because the VA has retained unclaimed class settlement funds owed to class members (Vietnam veterans or certain of their surviving family members) for the harms they suffered.  Those unclaimed funds should be distributed to benefit the interests of the class members, according to the applicable Consent Decree in this case and the law of *cy pres*.

Most class action settlements result in unclaimed funds and some, as here, do not specify who should receive unclaimed funds.  In such cases, the court must exercise discretion in determining how to distribute the funds, generally limited to the following alternatives: (1) *cy pres* distribution, (2) escheat to the government, and (3) reversion to a defendant party.  The funds at issue in Plaintiffs' motion are unclaimed because the VA (and class counsel in their own efforts) has been unable to locate class members or their beneficiaries in some cases.  Particularly in view of the time that has passed as a result of the VA's repeated failures to provide benefits owed to class members in a timely fashion, many class members are deceased and do not have a surviving beneficiary, or a beneficiary exists but cannot be located.  Therefore, this Court must decide how to distribute the unclaimed funds.

Here, a *cy pres* award is the most appropriate distribution to implement the objectives of the Consent Decree and the underlying statutes that assign benefits to Vietnam veterans and their survivors.  Escheat or reversion would allow the VA to avoid its obligation to compensate veterans and survivors for the serious harms they suffered.  Thus, Plaintiffs' motion seeks an award of *cy pres* funds to be used in a manner that benefits class members consistent with the statutory and consent decree objectives.  Plaintiffs propose that the appropriate recipient of this award is LSC, a nationwide legal organization that Plaintiffs have identified as having the capability to make

process for identifying and locating appropriate payees for those class members is currently still underway.  Plaintiffs will request such a distribution at the time the amount of unclaimed funds can be determined.

**MOTION FOR CY PRES DISTRIBUTION**

CASE NO. 3:86-CV-06160 (WHA)

competitive grants to nonprofit organizations to perform services for, and at no cost to, surviving veterans and certain of their family members that are aligned with the interests of members of the certified plaintiff class in this case.

## II.     STATEMENT OF FACTS RELEVANT TO THE MOTION

### A. The Statute Upon Which This Lawsuit Was Based—The Veterans' Dioxin and Radiation Exposure Compensation Standards Act of 1984

During the Vietnam conflict, the U.S. Armed Forces heavily sprayed chemical herbicides to defoliate dense jungle and forests in the Republic of Vietnam, the most well-known and widely used of which was Agent Orange. *See Nehmer v. United States Veterans' Admin.*, 712 F. Supp. 1404, 1407 (N.D. Cal. 1989) ("*Nehmer I*"). There was no dispute that these herbicides contained a contaminant named dioxin and that dioxin was "one of the most highly toxic substances known to the scientific community." *Nehmer I*, 712 F. Supp. at 1407 n.1 (quoting H.R. REP. 98-592, 1984 U.S.C.C.A.N. 4449, 4451). Yet, the VA's position during the 1970s and the 1980s was that only one disease—chloracne, a skin condition—is associated with exposure to dioxin. *Id.* at 1407. As a result, the VA denied tens of thousands of claims for disability or death compensation that Vietnam veterans and their survivors attributed to Agent Orange exposure.

As evidence began to mount that these herbicides resulted in seriously disabling diseases, Congress enacted The Veterans' Dioxin and Radiation Exposure Compensation Standards Act of 1984, Pub.L. 98–542, 98 Stat 2725 ("Dioxin Act"). The Dioxin Act was intended to ensure that all veterans who were disabled by reason of their exposure to dioxin in Vietnam and all survivors of veterans who died by reason of such dioxin exposure received appropriate VA disability and death compensation. *Nehmer I*, 712 F. Supp. at 1407. The Dioxin Act required the VA to conduct a public rulemaking proceeding to develop regulations governing payment of service-connected disability and death compensation "based on a veteran's exposure during service … in the Republic of Vietnam during the Vietnam era to an herbicide containing dioxin." *Id.*, 98 Stat. at 2727. In 1985, after completing the rulemaking proceeding, the VA promulgated a final regulation reiterating its previous position—that only one disease (chloracne) results from exposure to herbicides. *See* 38 C.F.R. § 3.311a(d) (1986) ("Rule 3.311a(d)").

### B.  The Court Certifies this Case as a Class Action and Invalidates
### VA's Agent Orange Compensation Regulation

Shortly thereafter, several Vietnam veterans and their survivors brought this class action lawsuit to challenge Rule 3.311a(d), the VA's Agent Orange compensation rule developed pursuant to the Dioxin Act.  *Nehmer I*, 712 F. Supp. at 1408-09.  In 1987, this Court certified a class of all Vietnam veterans and their survivors who had been denied VA disability or death benefits for a condition allegedly associated with herbicide exposure or who would be eligible to file a claim for such benefits in the future.  *Nehmer v. United States Veterans' Admin.*, 118 F.R.D. 113, 116, 125 (N.D. Cal. 1987) ("*Nehmer Class Cert.*").[2]  In 1989, the Court granted, in part, class members' motion for summary judgment and invalidated the part of Rule 3.311a providing that no condition other than chloracne merited presumptive service connection status due to exposure to herbicides containing dioxin, on the ground that the rule violated the Dioxin Act.  *Nehmer I*, 712 F. Supp. at 1423.

### C.  The Agent Orange Act of 1991

While the VA was in the process of promulgating regulations to replace the one that this Court invalidated, Congress enacted the Agent Orange Act of 1991 ("Agent Orange Act").  Pub. L. No. 102–4, 105 Stat 11 (Feb. 6, 1991), *now codified at* 38 U.S.C. § 1116(b) (originally codified at § 316(b)).  That Act provides that veterans who "served in the Republic of Vietnam" during the Vietnam era "shall be presumed to have been exposed during such service" to herbicides containing dioxin.  *Id.* at § 1116(a) & (f).  The Act also mandates that the VA accord service connection status to three diseases—non-Hodgkin's lymphoma, soft tissue sarcomas, and chloracne, *id.* at § 1116(a)(2)(C)—if manifested by a veteran who "served in the Republic of Vietnam" during the Vietnam era.  *Id.* at § 1116(a)(1)(B).  Finally, the Act holds that whenever the VA Secretary

---

[2]  Specifically, this Court certified a class consisting of "all current or former service members, or their next of kin (a) who are eligible to apply to, who will become eligible to apply to, or who have an existing claim pending before the Veteran's Administration for service connected disabilities or deaths arising from exposure during active-duty service to herbicides containing dioxin or (b) who have had a claim denied by the VA for service-connected disabilities or deaths arising from exposure during active-duty service to herbicides containing dioxin."  *Nehmer Class Cert.*, 118 F.R.D. at 116, 125.

---

4

1  determines that a "positive association exists between" exposure to herbicides and a disease, "the

2  Secretary shall prescribe regulations providing that a presumption of service connection is warranted

3  for that disease" due to herbicide exposure.  *Id.* at § 1116(b)(1).

4  ### D.  The Judicially Enforceable Consent Decree

5  　　Three months after the Agent Orange Act became law, the parties to this class action entered

6  into the Consent Decree.  ECF 141; *see also* ECF 460-1, Declaration of Richard V. Spataro

7  ("Spataro Decl.") ¶ 1, Ex. 1, Consent Decree.  The Consent Decree created a unique, ongoing

8  remedy to ensure complete relief to the class.  The Consent Decree requires the VA automatically—

9  regardless of any action or non-action by an eligible class member—to readjudicate any previously

10  filed claim based on a disease once the VA recognizes that disease, under the Agent Orange Act, as

11  meriting a presumption of service connection based on exposure to herbicides containing dioxin.  *Id.*

12  at ¶¶ 3, 5.  Specifically, the Consent Decree provides that "[a]s soon as a final rule is issued service

13  connecting, based on dioxin exposure, . . . any . . . disease in the future pursuant to the Agent Orange

14  Act . . . , . . . the VA shall promptly thereafter" (a) identify all class members who previously filed a

15  disability or death compensation claim based on such disease, (b) readjudicate that claim under the

16  new rule, and (c) if the claim is granted, assign as the effective date the date that the VA received the

17  claim or the date the claimant became disabled or death occurred, whichever is later.  *Id.*; *see also*

18  *Nehmer v. United States Dep't of Veteran Affairs*, 2020 U.S. Dist. LEXIS 207458, 2020 WL

19  6508529 (N.D. Cal. Nov. 5, 2020) (quoting Spataro Decl. ¶ 1, Ex. 1, Consent Decree at ¶¶ 3, 5).  The

20  end product of this process is typically described as a "*Nehmer* readjudication decision."  The class

21  is thus entitled to relief under the Consent Decree regardless of whether the individual who filed the

22  claim is available to receive the relief.

23  　　After approving the Consent Decree, the Court entered final judgment, stating that "final

24  judgment in this case incorporat[es] the terms of the Court's May 3, 1989 decision and the Final

25  Stipulation and Order [i.e., the Consent Decree] and ordering that this case shall be closed with the

26  defendants *subject to ongoing, enforceable obligations in the future*."  ECF 163 (Order of October 9,

27  1991) (emphasis added).

28  ### E.  The Retroactive Compensation Owed Pursuant to the Consent Decree

**MOTION FOR CY PRES DISTRIBUTION**

1    In the first five years following entry of the Consent Decree, the VA amended its regulations

2    under the Agent Orange Act to provide service connection for seven additional diseases based on

3    herbicide exposure:  Hodgkin's disease,[3] multiple myeloma, lung cancer, trachea cancer, larynx

4    cancer, and bronchus cancer,[4] and prostate cancer.[5]  *See Nehmer v. United States Veterans' Admin.*,

5    32 F. Supp. 2d 1175, 1177 n.2 (N.D. Cal. 1999) ("*Nehmer II*") (summarizing VA's changes).

6    Thereafter, the VA implemented the retroactive compensation provisions of the Consent Decree in

7    2001 by recognizing Type 2 diabetes' association with dioxin exposure, in 2003 by recognizing

8    chronic lymphocytic leukemia, in 2009 by recognizing primary AL Amyloidosos, in 2010 by

9    recognizing ischemic heart disease, Parkinson's disease, and chronic B-cell leukemias, and in 2021

10   by recognizing bladder cancer, hypothyroidism, and Parkinsonism.

11   As a result of the Consent Decree, VA issued more than 250,000 *Nehmer* readjudication

12   decisions and, as of 2020, paid more than $4.5 billion in retroactive disability and death benefits to

13   the more than 100,000 veterans and their survivors whom VA was able to locate.  *See* ECF 460-1,

14   Spataro Decl., ¶ 12; ECF 516-1, Venuti Decl., ¶ 4.  Unfortunately, in thousands of these *Nehmer*

15   readjudication decisions, VA wrongfully withheld millions of dollars in retroactive compensation in

16   violation of the Consent Decree.  To rectify these violations, class members filed five motions for

17   enforcement of the Consent Decree in this Court between 1998 and 2021.  As discussed *infra* in

18   Section III.C., the Court granted all five motions and the enforcement orders have thus far compelled

19   VA to pay, albeit belatedly, an aggregate of $301 million to more than 12,000 Vietnam veterans and

20   their survivors.

21   **F.  Locating Payees Owed Retroactive Compensation Pursuant to the Consent Decree**

22   This *cy pres* motion is not the first time this Court has been faced with the issue of unclaimed

23   funds owed pursuant to the Consent Decree.  A focus of class members' second enforcement motion

24   was the VA's application of the Consent Decree in the following common scenario: (1) the VA

25   amends its regulations under the Agent Orange Act to add a disease as herbicide related; (2) under

26

27   ---
     [3] 59 Fed. Reg. 5, 106 (Feb. 3, 1994).
     [4] 59 Fed. Reg. 29, 723 (June 9, 1994); *see also* 38 C.F.R. § 3.307(a)(6)(ii) (1997).
28   [5] 61 Fed. Reg. 57, 586 (Nov. 7, 1996).

1   the Consent Decree, the VA then identifies and readjudicates a past claim by a Vietnam veteran for

2   the newly added disease; (3) this *Nehmer* readjudication results in an award of retroactive

3   compensation to the veteran; but (4) the veteran is deceased at the time of the *Nehmer* readjudication

4   or subsequently dies before the VA is ready to make payment of the retroactive compensation owed

5   to the veteran.  Class counsel discovered that the VA interpreted the Consent Decree to allow the VA

6   to keep forever the unclaimed funds in such situations, rather than distribute amounts owed to the

7   veterans' surviving family members or their estates.  This Court ruled that the VA's refusal to pay

8   the amounts owed as retroactive compensation to certain survivors or the estates of deceased

9   veterans, violated the Consent Decree.  ECF 460-1, Spataro Decl. ¶ 4, Ex. 6, Second Enforcement

10  Order.

11       The VA appealed this decision, and in 2002, the Ninth Circuit affirmed in *Nehmer III*.  The

12  Ninth Circuit rejected the VA's argument "that it need not pay to the estates of deceased veterans all

13  accrued retroactive benefits owed to the veterans under the [Consent Decree]."  *Nehmer v. Veterans'*

14  *Admin.*, 284 F.3d 1158, 1162 (9th Cir. 2002) ("*Nehmer III*"); *see also* Spataro Decl. ¶ 3, Ex. 4.  To

15  codify this ruling, the VA issued a regulation providing:

16       [i]f a Nehmer class member entitled to retroactive benefits . . . dies prior to receiving
         payment of any such benefits, VA shall pay such unpaid retroactive benefits to the
17       first individual or entity listed below that is in existence at the time of payment: (i)
         The class member's spouse . . . (ii) The class member's child(ren) . . . (iii) The class
18       member's parent(s) . . . (iv) The class member's estate.

19  38 C.F.R. § 3.816(f)(i)—(iv);  *see also, Haddock v. United States*, 135 Fed. Cl. 82, 86 (2017).

20       Following *Nehmer III*, the VA began informing class counsel at the National Veterans Legal

21  Services Program (NVLSP) when the VA was unable to locate one or more appropriate payee(s)

22  owed retroactive compensation as a result of a *Nehmer* readjudication decision.  *See* Declaration of

23  Alessandra M. Venuti ("Venuti Decl."), attached hereto as Exhibit A, at ¶ g.  Pursuant to the 1999

24  Privacy Protection Order, the VA provided NVLSP with personal information (e.g., social security

25  numbers, addresses) about the unlocated veteran and their survivors.  NVLSP then hired, and

26  provided a summary of the relevant VA-supplied information to, private search firms so they could

27  attempt to locate appropriate payee(s).  *Id.* at ¶ j.  Through this process, NVLSP took the burden to

28

1   locate the appropriate payees for the VA to pay amounts owed to these payees.  *Id.*

2         The parties formalized this process for locating appropriate payees after 2010, when the VA

3   determined under the Agent Orange Act that three additional diseases—hairy-cell and other B-cell

4   leukemias, Parkinson's disease, and ischemic heart disease—were presumptively associated with

5   Agent Orange exposure.  *See Haddock,* 135 Fed. Cl. at 87; 38 C.F.R. § 3.309(e).  Pursuant to the

6   Consent Decree, the VA identified more than 160,000 Vietnam veterans and their survivors who

7   previously filed a disability or death claim based on one or more of these diseases but had not yet

8   been paid, and began a multi-year process of readjudicating these claims.  Venuti Decl., ¶ c.

9         At the outset of this multi-year effort, the VA distributed to its regional offices a training

10  guide entitled Department of Veterans Affairs, Veterans Benefits Administration, February 11, 2011

11  *Nehmer* Training Guide (*See* Exhibit 1 to Venuti Decl.), which its adjudicators are supposed to

12  follow.  That Guide states that "VA must notify class counsel if unable to identify payee."  (*See*

13  Exhibit 1 to Venuti Decl., at p. 12.)  According to the process agreed upon by the parties, "[c]lass

14  counsel utilizes a search firm that locates potential payees and class counsel provides the VA with

15  information to contact those persons and establish eligibility."  *Id.*  The VA provides to NVLSP the

16  names and personal information about potential payees (e.g., veterans and their spouses, children,

17  parents and estates) the VA cannot locate along with a description of VA's efforts to locate them.

18  *See* Venuti Decl., ¶ g.  NVLSP then undertakes to locate the appropriate payee(s): NVLSP digests

19  the VA-provided information; engages and provides an explanatory package to a private search firm;

20  receives a report describing the results of the private investigator's completed work; attempts to

21  contact the potential payee(s) using the search firm's report; and, if contact is made with the payee(s)

22  to whom the retroactive compensation is due, works with the payee(s) to obtain and submit to the

23  VA the required documents to establish entitlement to payment (e.g., marriage, birth and death

24  certificates, and estate documentation).  *Id.*, ¶¶ g-o.

25        Since 2014, NVLSP and its search firms have made diligent efforts to locate all payees

26  whom the VA claimed to be unable to locate, including family members and estates of deceased

27  class members.  *See generally* Decl. of P. Becnel ("Becnel Decl.") (attached hereto as Exhibit C).

28  These efforts have included searches of both open sources and subscriber-based investigative

8

1    databases, the latter of which include information from creditors, state motor vehicle records, and

2    court records.  *See id.*  Furthermore, investigators have searched the names and nonbiometric

3    identifiers of people who resided or associated with class members, and followed up by phone to

4    identify any potential beneficiaries who may not have appeared in the database searches.  *See id.*

5         NVLSP continues in these efforts to locate appropriate payees whom the VA claims to be

6    unable to locate and to get the VA to pay retroactive compensation owed under the Consent Decree.

7    Over the last decade, NVLSP's search efforts have located 1,892 class members and appropriate

8    payees owed retroactive compensation under the Consent Decree after the VA claimed to be unable

9    to locate them.  Venuti Decl., ¶ s.  After NVLSP provided the VA with their contact information and

10   documentation to establish eligibility, the VA paid these class members and payees an aggregate of

11   $38 million in retroactive compensation.  *See id*.

12                    **G.  Unclaimed Funds Pursuant to the Consent Decree**

13        In many cases, after NVLSP provided search firms with information describing the VA's

14   unsuccessful efforts to locate an appropriate payee for a class member owed retroactive

15   compensation, and after the search firms conducted extensive investigations, the search firms located

16   evidence demonstrating that no appropriate payees of the class member survive.  In other words, the

17   search firms located evidence documenting that the class member owed money is deceased and does

18   not have a surviving spouse, child, parent, or open estate.  Thus far, the search firms have reached

19   this conclusion for 869 deceased class members to whom VA owes retroactive compensation.[6]

20   Venuti Decl., ¶ u.

21        In other cases, the search firms ultimately concluded that appropriate payee(s) of the class

22   member owed retroactive compensation may still be alive, but after expenditure of substantial

23

24   _____

     [6] Separate and apart from the currently identifiable unclaimed funds, evidence of additional
25   unclaimed funds will likely be developed in the future.  This is because the parties' efforts to locate
     class members and survivors owed retroactive compensation are ongoing.  The VA has not
26   completed its obligations under the Consent Decree to issue *Nehmer* readjudication decisions to
     more than 70,000 class members who previously applied for one of the three Agent Orange related
27   diseases recognized by VA in 2021.  Venuti Decl., ¶ r.  It is likely that (a) the *Nehmer* readjudication
     decisions for some of these 70,000 class members will award retroactive compensation, but (b) the
28   parties will be unable to locate the appropriate payee(s).  Therefore, Plaintiff reserves the right to
     make a separate request for future identified unclaimed funds.

                                                    9

1    resources and diligent efforts, the payee(s) could not be located.  Thus far, the search firms have

2    reached this conclusion for 390 payees whose entitlement to compensation derives from one of 268

3    class members.  *Id.*, ¶ v.  Class counsel estimates that the VA owes the 1,137 class members in the

4    two aforementioned groups an aggregate of $63.1 million in unclaimed funds.[7]  *Id.*, ¶ w-z.

5                                    **III.    ARGUMENT**

6            The Consent Decree and the Court's Orders in this case make clear, as discussed above in

7    II.D., that when a *Nehmer* readjudication decision awards retroactive compensation to a class

8    member, the value of the award is owed regardless of whether an individual class member is then

9    available to receive the funds.  Thus, final enforcement and disposition of this Consent Decree

10   requires distribution of the outstanding funds owed by the VA for the benefit of the class members

11   and their survivors.  *See also Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011)

12   ("The settlement-fund proceeds, having been generated by the value of the class members' claims,

13   belong solely to the class members"); *Cushman v. Shinseki*, 576 F.3d 1290, 1298 (Fed. Cir. 2009

14   ("Veteran's disability benefits are nondiscretionary . . . . [E]ntitlement to [such] benefits is a

15   property interest protected by the Due Process Clause of the Fifth Amendment . . . ").

16           The Consent Decree subjects the VA to "ongoing, enforceable obligations in the future."

17   ECF 163.  Thus, unlike some settlements that create a fixed sum in a common settlement fund for

18   distribution, the Consent Decree specifies a process for aggregating a fund based on the VA's

19   ongoing enforceable obligations.  Through that process, more than $5 billion in settlement funds

20   have accumulated (in paid and unclaimed funds) for the benefit of individual class members.

21   Currently, the VA owes to class members and their payees an estimated $63.1 million in unclaimed

22   funds.

23        **A.  This Court Has Authority to Order the Disposition of the Unclaimed Funds**

24           Most class action settlements result in unclaimed funds.  *Joffe v. Google, Inc. (In re Google*

25

26   ---

     [7] Class counsel do not possess all the information needed to calculate the exact amount each such
     class member should have been paid, but the VA does possess this information.  Class counsel have
27   provided the VA, through the filing of this motion, a list of the names and VA claims file numbers of
     each of these 1137 class members to enable the VA to independently confirm this calculation.  To
     the extent the VA disputes Plaintiffs' calculation, and the parties cannot reach agreement on what is
28   owed, Plaintiff reserves the right to conduct tailored discovery to ascertain the amount.

1    *Inc. St. View Elec. Commc'ns Litig.)*, 21 F.4th 1102, 1110–11 (9th Cir. 2021); *Six (6) Mexican*

2    *Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990).  Many of these class

3    settlements contain terms specifying how unclaimed funds should be distributed, whereas some, like

4    the Consent Decree here, do not specify who should receive unclaimed funds.  When unclaimed

5    funds result from a class action settlement, but no distribution plan is in place, the court must

6    determine how to distribute such funds in the exercise of its inherent discretion.  *Six Mexican*

7    *Workers*, 904 F.2d at 1307; *In re Wells Fargo Sec. Litig.*, 991 F. Supp. 1193, 1194 (N.D. Cal. 1998);

8    *see also* Newberg on Class Actions § 10.15 at 512 (4th ed. 2002) ("[w]hen a class settlement

9    agreement is silent concerning distribution of any surplus . . . the court will have to make a

10   determination about the distribution of the surplus").

        Courts have broad discretionary and equitable powers in determining how to distribute such

12   funds but are generally limited to the following alternatives: (1) cy pres distribution, (2) escheat to

13   the government, and (3) reversion to a defendant party.[8]  *Six Mexican Workers*, 904 F.2d at 1307.  A

14   court's choice among these options is "guided by the objectives of the underlying statute and the

15   interests of the silent class members."  *Id.*

### B.  This Court Should Award a Cy Pres Distribution of the Unclaimed Funds For the Express Benefit of Class Members and Surviving Family Members

        A *cy pres* award is the most appropriate distribution to implement the objectives of the

19   Dioxin Act, Agent Orange Act, and Consent Decree, while simultaneously benefiting the interests of

20   uncompensated class members consistent with these objectives.  In this case, neither escheat nor

21   reversion would accomplish those purposes; both would allow the VA to avoid an established

22   obligation for serious harms suffered by veterans.  Thus, Plaintiffs' motion seeks an award of *cy pres*

23   funds.  As discussed below, Plaintiffs propose that the appropriate recipient of this award is LSC, for

24   the purpose of making grants to non-profit organizations to perform services for, and at no cost to,

---

[8] The Ninth Circuit has acknowledged but not expressly accepted the propriety of a fourth option: the pro rata distribution of funds to located class members.  *See, e.g.*, *Six Mexican Workers*, 904 F.2d at 1307 n.4 (citing *Van Gemert v. Boeing*, 739 F.2d 730, 736 (2d Cir. 1984)).  Plaintiffs do not propose such a distribution on the ground that it would be inequitable in this setting.  Living class members who have already received retroactive compensation under the Consent Decree have already benefitted and a pro rata distribution to them would not address the needs of other class members.  *See In re Lupron*, 677 F.3d 21, 35 (1st Cir. 2012); *Klier*, 658 F.3d at 475.

11

surviving veterans and certain family members that are aligned with the interests of members of the certified plaintiff class in this case. This group of grantees is hereinafter referred to as the "Nehmer Class Assistance Program" or "NCAP".

### 1. *Cy Pres* Distribution to the Legal Services Corporation Would Further the Objectives of the Underlying Statute

Any proposed *cy pres* distribution must be the "next best" distribution, having at least some "reasonable certainty" that a class member will be benefited. *Six Mexican Workers,* 904 F.2d at 1308; *Nachshin v. AOL, LLC,* 663 F.3d 1034, 1039 (9th Cir. 2011) (a *cy pres* recipient should be "tethered to the nature of the lawsuit and the interest of the silent class members"); *Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1080 (9th Cir. 2017). In other words, there must be "a driving nexus between the plaintiff class and the cy pres beneficiaries." *Dennis v. Kellogg Co.*, 697 F.3d 858, 865 (9th Cir. 2012). Thus, in selecting a *cy pres* beneficiary, courts are directed to consider whether such distribution (1) addresses the objectives of the underlying statutes, (2) targets the plaintiff class, or (3) provides reasonable certainty that any member will be benefited, especially considering the "size and geographic diversity" of the class members. *See Nachshin*, 663 F.3d at 1039–41. Here, a *cy pres* distribution can be fashioned consistent with each of these considerations. Plaintiffs propose that LSC is the appropriate beneficiary of that distribution.

Plaintiffs' proposed *cy pres* award would promote the objectives of the underlying statute. This lawsuit was originally brought to enforce the Dioxin Act. *See Nehmer I,* 712 F. Supp. at 1407. The overarching purpose of that statute was to require the VA to compensate veterans who were exposed to Agent Orange during their military service in Vietnam and their survivors for the injuries and deaths related to that exposure. Plaintiffs propose here a *cy pres* distribution to a non-profit entity in a manner specifically designed to compensate—by providing grants for services, programming, or other appropriate purposes, as described below—those class veterans, their surviving family members, or other beneficiaries as appropriate.

To determine an appropriate beneficiary, NVLSP has assessed organizations that could be entrusted with administering the proposed *cy pres* distribution. That assessment considered organizations known to NVLSP to have a nationwide reach and the ability to make determinations

on grant applications and administer a large amount of funds for the specific benefit of Vietnam veterans and surviving family members. NVLSP has concluded that LSC is uniquely situated to perform the mission of the proposed award of cy pres funds.

There can be no doubt that LSC has the competence, professional experience, expertise, and independence to perform the mission described above and be entrusted with the *cy pres* funds. LSC is the single largest funder of civil legal aid for low-income Americans in the nation and provides these funds nationwide. Established in 1974, LSC operates as an independent 501(c)(3) nonprofit corporation led by a bipartisan board of directors whose 11 members are appointed by the President and confirmed by the Senate.[9] LSC promotes equal access to justice by awarding grants to legal services providers through a competitive grants process; conducting compliance reviews and program visits to oversee program quality and compliance with statutory and regulatory requirements as well as restrictions that accompany LSC funding. LSC distributes more than 90 percent of its total funding nationwide to 130 independent nonprofit legal aid programs with more than 800 offices, which provides a broad reach that is particularly suited to the proposed *cy pres* distribution. *See id*.

> **2.    *Cy Pres* Distribution to the Legal Services Corporation Targets the Plaintiff Class**

As discussed in Section II.G, the evidence developed by class counsel shows that the unclaimed funds derive from the fact that the class members owed benefits under the Consent Decree are deceased and no appropriate payee (*i.e.*, no surviving spouse, child, parent, or open estate) currently exists or can be located. Class counsel have exhausted all reasonable avenues to locate appropriate payees of these funds.

As fully set forth in the declaration of Philip Becnel, comprehensive efforts have been made to locate all living class members owed retroactive compensation, as well as the spouse, children, parents, and estates of any class members already deceased. These efforts included searches of both open sources and subscriber-based investigative databases, the latter of which include information

---

[9] Legal Services Corporation, Who We Are (last visited 7/25/2024), https://www.lsc.gov/about-lsc/who-we-are.

1    from creditors, state motor vehicle records, and court records, to name only a few.  Furthermore,

2    investigators have searched the names and nonbiometric identifiers of people who resided or

3    associated with the class members, and followed up by phone to determine if there are potential

4    beneficiaries who may not have appeared in the database searches.  *See generally* Becnel Decl. ¶¶ 6-

5    11.  If people could be found through reasonable efforts, then the multi-prong process followed here

6    would already have located them (especially given the opportunity to share in a monetary award).

7    *See* Becnel Decl., ¶ 13.

8        Thus, targeting the plaintiff class here requires an organization intimately familiar with the

9    class members and their family members.  This is just one more reason that LSC is an appropriate *cy

10   pres* beneficiary here.  LSC recently investigated and is familiar with the unmet legal needs of

11   veterans and their families.  In 2020, LSC created the Veterans Task Force to examine the gap

12   between veterans' legal needs and the services available to meet those needs, and the reasons for the

13   gap.[10]  The Task Force reported that 71% of households with veterans or service members reported

14   experiencing a civil legal problem in the past year and of those households, 21% reported

15   experiencing six or more legal problems in the preceding year.  Task Force Report at 10.  The Task

16   Force identified a wide variety of the unmet legal needs of veterans.  *Id.* at 20-29.  Appendix A to

17   this motion, which lists the eligible activities for which an NCAP grantee may use awarded *cy pres*

18   funds, includes most of these unmet legal needs.

19       Under the proposed *cy pres* award, LSC would operate a competitive grant process to widely

20   solicit proposals from non-profit organizations nationwide for each of the proposed activities

21   (provided in Appendix A), evaluate them based on their relative merits, and require the grant funds

22   to be used for one or more of the proposed activities.  LSC would have authority to use part of the *cy

23   pres* award to publicize the availability of the services provided by its grantees and/or require some

24   or all of its grantees to publicize their services to *Nehmer* class members and family members.  LSC

25   would be barred from making a grant to the employers of class counsel, or from requiring an NCAP

26   ---
     [10] *See* Legal Services Corporation, LSC Veterans Task Force (last visited 7/25/2024), *available at*
27   https://www.lsc.gov/initiatives/lsc-task-forces/lsc-veterans-task-force; LSC 2021 Report of the
     Veterans Task Force (last visited 7/25/2024), *available at* https://lsc-
28   live.app.box.com/s/buoeznt4t7284462luqxcvqg1p1lnatu ("Task Force Report").

grantee to contract with class counsel or their employers.  But after receipt of a grant, NCAP

grantees would not be barred from voluntarily contracting with or seeking legal advice from class

counsel or their employers.  Organizations that are currently funded by LSC would not be prohibited

from receiving a grant.  Thus, LSC's planned programming will appropriately target the class,

including those members who have been silent.

### 3.    *Cy Pres* Distribution to Legal Services Corporation Provides Reasonable Certainty That Class Members Will be Benefited

Finally, a *cy pres* award to the Legal Services Corporation in this case would ensure that

unclaimed funds are distributed in a way that benefits class members' interests.  Specifically,

Plaintiffs propose the following measures to ensure the award benefits class members' interests.

NCAP grantees would be required to meet the criteria of sections 501(c)(3) or 501(c)(19) of

the Internal Revenue Code to ensure they are not operating for profit.  The terms of a grant would

require the grant funds to be used for one or more of the numerous eligible activities set forth in

Appendix A.  NVLSP has prepared this list of activities based on decades of experience serving the

needs of  veterans and survivors who are *Nehmer* class members.  *See* Appendix A.  These activities

include providing legal services in proceedings before the U.S. Department of Veterans Affairs, the

U.S. military departments, and the Social Security Administration, or in consumer fraud,

landlord/tenant and other housing disputes, and family law matters.

NCAP grantees would be required to engage in these activities for the benefit of veteran

members of the certified class in *Nehmer* and their heirs (i.e., veterans who served in the Republic of

Vietnam during the Vietnam-era and certain surviving family members of deceased veteran class

members[11]).  Class member veterans include those who set foot on the land mass of Vietnam, or

---

[11] This Court defined the certified class as all Vietnam veterans who are "current or former service members, or their next of kin (a) who are eligible to apply to, who will become eligible to apply to, or who have an existing claim pending before the Veteran's Administration for service-connected disabilities or deaths arising from exposure during active-duty service to herbicides containing dioxin or (b) who have had a claim denied by the VA for service-connected disabilities or deaths arising from exposure during active-duty service to herbicides containing dioxin." *Nehmer Class Cert.,* 118 F.R.D. at 116.

Under both the statute that the *Nehmer* lawsuit was brought to enforce (that is, the Veterans' Dioxin and Radiation Exposure Compensation Standards Act, Pub. L. 98-542) and the statute

served on the inland waterways or territorial waters of Vietnam.  *See Nehmer,* 2020 U.S. Dist. LEXIS 207458, 2020 WL 6508529 (N.D. Nov. 5, 2020).  Eligible surviving family members of these veterans include surviving spouses, regardless of the surviving spouse's current marital status, and surviving children, regardless of age.[12] LSC's administrative costs to operate this grant-making program would be limited to 5% of the *cy pres* award—the percentage to which LSC has typically been able to limit its administrative costs for similar grant-making programs.

**C. Reversion of the Unclaimed Funds to Defendants Is Not an Option and Would Inequitably Benefit the Wrongdoer**

Reversion to a defendant is not an appropriate option when the underlying statute includes a deterrent objective and the settled violations were unlawful or wrong in nature.  *Six Mexican Workers*, 904 F.2d at 1309.  Instead, reversion is only permissible in "exceptional circumstances." *Joffee*, 21 F.4th at 1111 (quoting *Hodgson v. YB Quezada*, 498 F.2d 5, 6 (9th Cir. 1974)).  Here, as discussed above, the Dioxin Act and the Agent Orange Act contain deterrent objectives aimed directly at the VA in response to a long history of wrongdoing by failing to provide timely relief to injured class members.  There are no exceptional circumstances that would make reversion appropriate; therefore, reversion to the VA would be contrary to Ninth Circuit precedent.

Allowing the VA to retain funds due to serial violations of the Consent Decree and the VA's own "inability to track down" veterans or their survivors would "benefit the wrongdoer."  *See Holtzman v. Turza*, 828 F.3d 606, 609 (7th Cir. 2016).  It would also "undermine the deterrence function of class actions . . . by rewarding the alleged wrongdoer simply because distribution to the class [is not] viable."  *In re Lupron Mktg. and Sales Pracs. Litig.,* 677 F.3d 21, 33 (1st Cir. 2012).

---

incorporated into the 1991 *Nehmer* Consent Decree (the Agent Orange Act of 1991, 38 U.S.C. § 1116) those veterans who served in the Republic of Vietnam during the Vietnam era are presumed exposed during active-duty service to herbicides containing dioxin (i.e., Agent Orange).  *See* 38 U.S.C. § 1116(c); 38 C.F.R. § 3.307(a)(6)(iii) (2023).  All of these veterans are therefore class members because they are "eligible to apply to" the VA for service-connected disabilities or deaths arising from herbicide exposure.

[12] These survivors are included as eligible beneficiaries of the use of grant funds because of their status under the 1991 Nehmer Consent Decree, which requires VA to pay retroactive benefits owed to deceased class members to the class member's surviving spouse regardless of current marital status and to the class member's surviving children, regardless of age.

**MOTION FOR CY PRES DISTRIBUTION**

CASE NO. 3:86-CV-06160 (WHA)

1    "The fact that it might be difficult or impossible to locate some class members" is not a proper basis

2    to allow the VA to retain the unclaimed funds.  *See Physician Healthsource, Inc. v. A-S Medication*

3    *Sols., LLC*, No. 12 C 5105, 2020 WL 3087070, at *2 (N.D. Ill. June 8, 2020).

4        The extensive history of this case demonstrates that reversion would inequitably reward the

5    wrongdoer—the VA—for withholding from class members the disability and death compensation

6    owed to them under the Consent Decree.  This compensation has been owed for so long that it has

7    now become impracticable to disburse monies to class members directly.  Indeed, reversion would

8    wrongfully allow the VA to profit from the fact that its Consent Decree violations contributed to the

9    existence of unclaimed funds in the first place.  Among other things, due to the VA's intransigence,

10   class members had no option except to bring five motions to enforce the Consent Decree to secure

11   compliance.[13]  This Court granted each of the five enforcement motions; the VA appealed twice to

12   the Ninth Circuit, and lost both times.[14]

13       First, class members challenged, in 1995, the VA's overly narrow interpretation concerning

14   when it must readjudicate claims.  This Court held that the VA's directive violated the Consent

15   Decree, and class counsel subsequently identified approximately 1,300 class members who had been

16   wrongly denied retroactive disability or death compensation—the VA eventually paid an aggregate

17   of $31 million in belated compensation to 1,300 class members.  *Nehmer II*, 32 F. Supp. 2d at 1184;

---

18   [13] *See* Declaration of Richard V. Spataro (ECF 460-1) (hereinafter, "Spataro Decl.") at ¶ 2, Ex. 3,
19   Dkt. No. 210 (Plaintiffs' Motion for Enforcement of Final Judgment, filed June 25, 1998)) ("First
     Enforcement Motion"); ¶ 4, Ex. 5, Dkt. No. 226 (Plaintiffs' Motion for Enforcement of Final
20   Judgment, filed Feb. 2, 2000) ("Second Enforcement Motion"); ¶ 11, Ex. 11, Dkt. No. 331
     (Plaintiffs' Motion for An Order to Show Cause Why Defendants Should Not Be Held In Contempt
21   of the Final Stipulation and Order, filed June 4, 2004); ¶ 11, Ex. 12, Dkt. No. 346 (Plaintiffs'
     Motion for Clarification and Enforcement of the 1991 Final Stipulation and Order, filed Feb. 18, 2005)
22   ("Third Enforcement Motion"); Plaintiffs' Motion for Enforcement of Final Judgment, filed July 10,
     2020, ECF 460 ("Fourth Enforcement Motion"); *Nehmer v. U.S. Dept. of Veteran Affairs*, 2021 U.S.
23   Dist. LEXIS 218075 (N.D. Cal. Nov. 10, 2021) (Order granting Fifth Enforcement Motion).

24
25   [14] *See Nehmer v. Veterans Admin.*, 32 F. Supp. 2d 1175 (N.D. Cal. 1999); ("First Enforcement
     Order") ("*Nehmer II*"); Spataro Decl. ¶ 4, Ex. 6, Dkt. No. 269 (Class Action Order, filed Dec. 12,
26   2000) ("Second Enforcement Order"), *aff'd Nehmer v. Veterans' Admin.*, 284 F.3d 1158, 1161 (9th
     Cir. 2002) ("*Nehmer III*"); Spataro Decl. ¶ 11, Ex. 13, Dkt. No. 354 (Order Granting Plaintiffs'
27   Motion for Clarification, filed Dec. 1, 2005) (collectively "Third Enforcement Order"), *aff'd Nehmer
     v. U.S. Department of Veterans Affairs*, 494 F.3d 846, 851-52 (9th Cir. 2007) ("*Nehmer IV*").

28

---

17

**MOTION FOR CY PRES DISTRIBUTION**

1    *see* ECF 460-1, Spataro Decl. at ¶ 3.  Second, the Court invalidated the VA's directive in 1999 that

2    prostate cancer claimants were not entitled to retroactive compensation under the Consent Decree,

3    and the VA belatedly paid almost $5 million in previously withheld retroactive compensation to

4    more than 1,200 Vietnam veterans and surviving family members.  *See* ECF 460-1, Spataro Decl. at

5    ¶ 4.  The third enforcement motion was granted by this Court and affirmed by the Ninth Circuit five

6    years later.  The Ninth Circuit stated:

> What is difficult for us to comprehend is why the [VA], having entered into a
> settlement agreement and agreed to a consent order [many] years ago, continues to
> resist its implementation so vigorously, as well as to resist equally vigorously the
> payment of desperately needed benefits to Vietnam war veterans who fought for their
> country and suffered grievous injury as a result of our government's own conduct . . .
> . [O]ne thing is clear. Those . . . Americans who risked their lives in their country's
> service . . . are deserving of better treatment from the Department of Veterans Affairs
> than they are currently receiving. We would hope that . . . our government will now
> respect the legal obligations it undertook in the Consent Decree . . . , that
> obstructionist bureaucratic opposition will now cease, and that our veterans will
> finally receive the benefits to which they are morally and legally entitled.

14   *Nehmer IV*, 494 F.3d at 864-65.

15       Unfortunately, the Ninth Circuit's hope that the VA would respect its legal obligations under

16   the Consent Decree proved false and, after 2007, class counsel discovered two additional systemic

17   violations and demanded relief from the VA, which agreed to pay 2,600 class members an aggregate

18   of more than $58 million in retroactive compensation.  ECF 410-1, Spataro Decl. at ¶ 8.

19       In 2020, the fourth enforcement motion challenged the VA's change in position on whether

20   veterans who served aboard a ship in the territorial waters of Vietnam, but never set foot on the land

21   mass of Vietnam (known colloquially as "Blue Water Vietnam veterans"), are subject to the terms of

22   the Consent Decree.  From 1991 to 2002, the VA had agreed that those who served in the territorial

23   seas of Vietnam were class members and entitled to retroactive compensation under the Consent

24   Decree.  But in 2002, it did an about face.  As a result, when the VA added new diseases as related to

25   herbicide exposure under the Agent Orange Act after 2002, the VA denied the retroactive disability

26   and death compensation owed under the Consent Decree to thousands of Blue Water Vietnam

27   veterans and their survivors.

28       In 2019, the Federal Circuit, acting *en banc*, struck down the VA's mistaken construction of

1   the Agent Orange Act and held that Congress had unambiguously intended to include all Blue Water

2   Vietnam veterans in that statute's presumption that exposure occurred. *See Procopio v. Wilkie,* 913

3   F.3d 1371, 1381 (Fed. Cir. 2019 (en banc). After and despite *Procopio*, the VA would not

4   readjudicate the prior claims of the thousands of *Nehmer* class members who had been improperly

5   denied retroactive benefits due to the VA's wrongful exclusion of Blue Water Vietnam veterans

6   from the scope of the Agent Orange Act and the Consent Decree. Class members' fourth

7   enforcement motion sought an Order requiring the VA to readjudicate certain prior denials of

8   retroactive compensation to Blue Water Vietnam veterans and their survivors, and the Court ordered

9   readjudication. *See* ECF 460, ECF 95.

10       The fourth enforcement motion illustrates the great extent to which the VA's wrongdoing has

11   contributed to the unclaimed funds that are the subject of this *cy pres* motion. As a result of the

12   Court's enforcement Order, the VA ultimately reported that it paid an aggregate of nearly $207

13   million in retroactive compensation to 7,019 Blue Water Vietnam veterans and their survivors. *See*

14   Venuti Decl., ¶ d. But the VA also informed class counsel that it had determined it owed retroactive

15   compensation under the Consent Decree to other Blue Water Vietnam veterans, and was unable to

16   pay them because the veterans were now deceased and the VA could not locate an appropriate

17   payee(s). *Id.* After using private search firms, class counsel then determined that no appropriate

18   payee could be found—in many instances because eligible survivors were no longer alive and no

19   estate for those veterans could be found. *Id. ¶ u.*

20       The unclaimed funds in these cases are part of the unclaimed funds addressed by this *cy pres*

21   motion. If the VA's original *Nehmer* readjudication decision denying retroactive benefits issued

22   many years ago to these Blue Water Vietnam veterans had instead been granted—when many of

23   these veterans were alive—the retroactive benefits awarded would already have been distributed

24   directly to class members while they were still alive. It is therefore undoubtedly true that if the VA

25   had fully complied with the Consent Decree over the last three decades, class members' four

26   enforcement motions would not have been necessary and the amount of unclaimed funds would be

27   much lower.

28   **D.  Escheat to the Government is Disfavored and Would Inequitably Benefit the Wrongdoer**

1     Escheatment to the federal government (*i.e.*, under 28 U.S.C. § 2041 or § 2042) is similarly

2   an inappropriate distribution method as it fails to achieve the primary objective in distributing funds

3   either to satisfy the objectives of the Dioxin and Agent Orange Acts or benefit the interest of silent

4   class members.  Indeed, this option is disfavored in comparison to *cy pres* distribution where such

5   reversion would contradict the goals of the statute at issue.  *See, e.g.*, *Six (6) Mexican Workers*, 904

6   F.2d at 1308.

7     Moreover, because the VA itself is part of the government, distributing the unclaimed funds

8   to the federal government here would inequitably reward the wrongdoer for improperly withholding

9   disability and death compensation owed to class members under the Consent Decree.  Indeed,

10  escheat, like reversion, would wrongfully allow the government to profit from the fact that its

11  Consent Decree violations caused decades of delay that contributed to the existence of unclaimed

12  funds in the first place.  *See* Section III.3, *supra*.

13                                **CONCLUSION**

14    For the foregoing reasons, this Court should grant the instant motion and order the unclaimed

15  class funds be directed to LSC, and order LSC to use these funds to make grants through a

16  competitive process to other non-profit organizations to perform specified services without cost to

17  benefit individual class members and certain of their surviving family members.

18

19
    Dated: August 13, 2024
20
                                     Respectfully Submitted,
21
                                     By:  _/s/ Sean A. Commons_____
22                                       Sean A. Commons

23                                     Barton F. Stichman
24
                                     *Attorneys for Plaintiffs Beverly Nehmer, et al.*
25

26

27                                   NATIONAL VETERANS LEGAL SERVICES
                                     PROGRAM
28                                   Barton F. Stichman (DC SB 218834, *pro hac vice*)

                                     20

Renee A. Burbank (CT SB 440300, *pro hac vice* application forthcoming)
1100 Wilson Blvd., Suite 900
Arlington, VA 22209
Tel: 202-265-8305
Email: bart@nvlsp.org
        Renee.burbank@nvlsp.org

SIDLEY AUSTIN LLP
Sean A. Commons (SBN 217603)
Caleb J. Bowers (SBN 332189)
Brooklyn Hildebrandt (SBN 350707)
350 South Grand Avenue
Los Angeles, CA 90071
Tel: 213-896-6000
Email: scommons@sidley.com
        cbowers@sidley.com
        bhildebrandt@sidley.com

**APPENDIX A**

The following provides a proposed list of activities that the Legal Services Corporation may require an NCAP grantee to engage in using *cy pres* funds for the benefit of *Nehmer* class members and surviving family members.

1.  Free legal representation of an eligible individual in a proceeding involving any of the following:

- VA benefits, including, but not limited to, service-connected disability compensation, non-service-connected disability pension, service-connected death compensation, death pension, overpayments of VA benefits, VA debt collection, educational benefits, VA housing, VA home loans, VA nursing home care, benefits administered by VHA (including eligibility for VA health care, VHA reimbursement of medical and travel expenses, VHA stipends for caregivers of disabled veterans), clothing allowance, fiduciary matters, or character of discharge determinations;

- Social Security Administration benefits, including social security disability, SSI, Medicare, or Medicaid;

- Combat-Related Special Compensation, CRDP, retired pay, or other pay disputes with the Defense Finance and Accounting Service and a military department;

- pursuit of a discharge upgrade for veterans who received less than an honorable discharge from military service, or correction of military records to change the reason for discharge or to show entitlement to longevity or medical disability retirement;

- eviction from housing, landlord/tenant, housing/rental vouchers; mortgages, access to nursing homes, disputes involving payments or access to state-operated veterans homes, obtaining in-home assistance, or other type of housing disputes;

- debt collection and debt relief;

- consumer fraud;

- employment issues;

- unemployment compensation; or

- custody and child support, guardianship, protection orders, and divorce.

22

2.  Other types of free legal assistance to eligible individuals, specifically: estate planning and drafting medical directives.

**MOTION FOR CY PRES DISTRIBUTION**

CASE NO. 3:86-CV-06160 (WHA)