BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
LESLEY R. FARBY
Assistant Director
Federal Programs Branch
M. ANDREW ZEE (CA Bar No. 272510)
United States Department of Justice
Civil Division, Federal Programs Branch
450 Golden Gate Avenue, Room 7-5395
San Francisco, CA 94102
Telephone: (415) 436-6646
Fax: (415) 436-6632
Email: m.andrew.zee@usdoj.gov

*Attorneys for Defendant*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| BEVERLY NEHMER, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 3:86-cv-06160-WHA |
| | ) |
| U.S. DEPARTMENT OF VETERANS | ) **DEFENDANT'S MEMORANDUM IN** |
| AFFAIRS, | ) **OPPOSITION TO PLAINTIFFS'** |
| | ) **MOTION FOR CY PRES DISTRIBUTION** |
| Defendant. | ) **OF RESIDUE FUNDS** |
| | ) |
| | ) Date: October 10, 2024 |
| | ) Time: 8:00 a.m. |
| | ) Place: Courtroom 12, 19th Floor |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 3

ARGUMENT .................................................................................................................. 8

I.    The Consent Decree contains no cy pres provision and no modification
      provision, and did not result in a settlement fund from which purported unclaimed
      funds can be distributed. ........................................................................................ 9

II.   Ordering a cy pres award would circumvent the restrictions imposed by
      Congress on veterans' disability compensation and violate the Appropriations
      Clause.................................................................................................................. 14

III.  Plaintiffs' proposal that the Legal Services Corporation run a sui generis
      grants program with funds intended for disability compensation would not
      further the objectives of the underlying statutes or the Consent Decree. ............ 18

IV.   Denying the requested cy pres award would not result in "reversion"
      to the VA .............................................................................................................. 23

CONCLUSION.............................................................................................................. 24

# TABLE OF AUTHORITIES

## Cases

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
   528 U.S. 167 (2009)...................................................................................................... 20

*In re Baby Prod. Antitrust Litig.*,
   708 F.3d 163 (3d Cir. 2013)........................................................................................ 22

*In re Google Inc. Street View Elec. Commc'ns Litig.*,
   21 F.4th 1102 (9th Cir. 2021) ..................................................................................... 12

*In re Hotel Tel. Charges*,
   500 F.2d 86 (9th Cir. 1974) .................................................................................. 15, 16

*In re Lupron Mktg. & Sales Practices Litig.*,
   677 F.3d 21 (1st Cir. 2012).......................................................................................... 23

*In re Wells Fargo Securities Litigation*,
   991 F. Supp. 1193 (N.D. Cal. 1998) .......................................................................... 12

*Keepseagle v. Perdue*,
   856 F.3d 1039 (D.C. Cir. 2017) .................................................................................. 14

*Klier v. Elf Atochem N. Am.*,
   658 F.3d 468 (5th Cir. 2011) ................................................................................ 11, 13

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)...................................................................................................... 19

*Mirfasihi* v. *Fleet Mortg. Corp.*,
   356 F.3d 781 (7th Cir. 2004) ................................................................................ 14, 22

*Nachshin v. AOL, LLC*,
   663 F.3d 1034 (9th Cir. 2011) ....................................................................... 13, 18, 23

*Nehmer v. U.S. Veterans' Admin.*,
   118 F.R.D. 113 (N.D. Cal. 1987)................................................................................... 3

*Nehmer v. U.S. Veterans' Admin.*,
   712 F. Supp. 1404 (N.D. Cal. 1989) ............................................................................. 3

*Nehmer v. U.S. Dep't of Veterans Affs.*,
   Case No. C 86-06160-WHA, 2020 WL 6508529 (N.D. Cal. Nov. 5, 2020)............... 4

*OPM v. Richmond*,
  496 U.S. 414 (1990) .................................................................................. 12, 14, 22, 24

*Pappanikoloaou v. Adm'r of Veterans Admin.*,
  762 F.2d 8 (2d Cir. 1985) ........................................................................................ 12

*Reeside v. Walker*,
  52 U.S. 272 (1850) .............................................................................................. 14, 15

*S.E.C. v. Bear Sterns*,
  626 F.Supp.2d 402 (S.D.N.Y. 2009) ...................................................................... 13

*Six (6) Mexican Workers v. Arizona Citrus Growers*,
  904 F.2d 1301 (9th Cir. 1990) ............................................................... 11, 12, 15, 16

*Speers v. United States*,
  38 Fed. Cl. 197 (1997) .......................................................................................... 14

*United States* v. *Sanchez-Gomez*,
  138 S. Ct. 1532 (2018) ..................................................................................... 19, 20

## **Constitution**

U.S. Const. art. I .................................................................................................. 14

## **Statutes**

31 U.S.C. § 3711 .................................................................................................. 13

38 U.S.C. § 313 .............................................................................................. 15, 23

38 U.S.C. § 511 .................................................................................................. 12

38 U.S.C. § 1110 ......................................................................................... 4, 16, 17

38 U.S.C. § 1113 .................................................................................................. 16

38 U.S.C. § 1114 ............................................................................................. 17, 19

38 U.S.C. § 1116 ......................................................................................... 4, 10, 17

38 U.S.C. § 1155 ............................................................................................. 17, 19

38 U.S.C. § 1158 .................................................................................................. 6

38 U.S.C. § 5121 ................................................................................................ 6, 19

38 U.S.C. § 5902 ................................................................................................ 20

28 U.S.C. §§ 2041 ............................................................................................... 24

31 U.S.C. §§ 1341 ............................................................................................... 23

31 U.S.C. §§ 1350 ............................................................................................... 23

38 U.S.C. §§ 1110 ............................................................................................... 10

38 U.S.C. §§ 4100-4115 ...................................................................................... 19

38 U.S.C. §§ 5101 ............................................................................................... 10

38 U.S.C. §§ 5103 ............................................................................................... 17

38 U.S.C. §§ 5110 ............................................................................................... 10

50 U.S.C. App. §§ 533 ........................................................................................ 21

50 U.S.C. App. §§ 534 ........................................................................................ 21

50 U.S.C. App. §§ 537 ........................................................................................ 21

Consolidated Appropriations Act 2024,
  Pub. L. No. 118-42, 138 Stat. 25 (2024) ........................................................ 5

Consolidated Appropriations Act 2021,
  Pub. L. No. 116-260, 134 Stat. 1182 (2021) ................................................... 5

Further Consolidated Appropriations Act 2020,
  Pub. L. No. 116-94, 133 Stat. 2534 (2020) ..................................................... 5

Consolidated Appropriations Act, 2022
  Pub. L. No. 117-103, 136 Stat. 49 (2022) ....................................................... 5

Consolidated Appropriations Act 2023,
  Pub. L. No. 117-328, 136 Stat. 4459 (2023) ................................................... 5

Consolidated Appropriations Act 2024,
  Pub. L. No. 118-42, 138 Stat. 25 (2024) .............................................. 5, 15, 23

Further Consolidated Appropriations Act 2020,
  Pub. L. No. 116-94, 133 Stat. 2534 (2020) ..................................................... 5

National Defense Authorization Act,
    Pub. L. No. 116-283, 134 Stat. 4785 (2021) .................................................. 5

Veterans' Dioxin and Radiation Exposure Compensation Standards Act (Dioxin Act),
    Pub. L. No. 98-542, 98 Stat. 2725 (1984) ...................................................... 3

**Regulations**

38 C.F.R. § 3.158(c) ............................................................................................ 6

38 C.F.R. § 3.309(e) ............................................................................................ 5

38 C.F.R. § 3.311a(c) .......................................................................................... 3

38 C.F.R. § 3.311a(c) .......................................................................................... 6

38 C.F.R. § 3.816(f)(1) ........................................................................................ 7

38 C.F.R. § 4.119 DC 7913 ................................................................................ 17

38 C.F.R. §§ 1.910(a) ........................................................................................ 13

38 C.F.R. §§ 1.911a ........................................................................................... 13

38 C.F.R. §§ 3.656 .............................................................................................. 6

38 C.F.R. §§ 3.656 .............................................................................................. 6

**Other Authorities**

Alexander Hamilton,
    The Federalist No. 78 ..................................................................................... 14

Press Release, VA plans expansion of benefits for disability claims for conditions related
to certain toxic exposure,
    https://news.va.gov/press-room/va-plans-expansion-of-benefits-for-disability-claims-for-
    conditions-related-to-certain-toxic-exposures/ (May 27, 2021) ................... 6

Martin H. Redish, Peter Julian & Samantha Zyontz, *Cy Pres Relief*
*and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis*,
    62 FLA. L. REV. 617 (2010) ..................................................................... 13, 15

Supportive services for Veteran Families,
    https://www.va.gov/homeless/ssvf/index.html .......................................... 21

VA Home Loans,
   https://benefits.va.gov/homeloans/ ........................................................... 21

Veteran Readiness and Employment,
   https://www.benefits.va.gov/vocrehab/ ....................................................... 21

## INTRODUCTION

When the Department of Veterans Affairs and the Plaintiff class negotiated the settlement of this case more than three decades ago, they agreed to specific departures from otherwise applicable federal law governing the payment of veterans benefits. Those departures changed the process for how the VA would conduct new adjudications for veteran class members who suffered disabilities from their exposure to herbicides while serving in Vietnam. The settlement, or "Consent Decree," as the parties have come to call it, did not contemplate payment of a sum certain by the VA, in large part because the number of claims that would require readjudication, as well as their outcome, was not knowable. Instead, under the Consent Decree, disability benefits must be paid after an individual readjudication is complete, which entails paying the veteran himself or, as is often the case, the veteran's qualifying next of kin. There is not, and never has been, any settlement fund from which these class members are paid. And therefore, there are no "residual" or "unclaimed" funds from the settlement that exist for distribution to a non-party. Plaintiffs' new request, more than thirty years after the parties entered into the Consent Decree, for a cy pres award to the non-party Legal Services Corporation (LSC) accordingly does not satisfy the basic framework for the application of the cy pres doctrine.

Plaintiffs' request also runs afoul of express restrictions Congress has imposed on the funds it appropriated to the VA. When Congress appropriates funds for, among other things, the agency's Consent Decree obligations to pay class members' awards, Congress does so for the express purpose of paying veterans' disability compensation benefits. And nowhere has Congress authorized those appropriated funds to be used for any other purpose, such as payment to a third-party entity like LSC. Plaintiffs' proposed cy pres award would contravene those express congressional restrictions by rerouting appropriated funds from their intended beneficiaries—disabled veterans—to a new recipient—LSC and the lawyers who receive the grants proposed by Plaintiffs. Doing so would violate the fundamental tenet of the Appropriations Clause: Congress, not the Executive or litigants before the Judiciary, holds the power of the purse.

*Nehmer v. VA*, Case No. 3:86-cv-06160-WHA
Defendant's Opposition to Plaintiffs' Motion for Cy Pres Distribution

Furthermore, even if a cy pres award could be ordered here, Plaintiffs' proposal is untethered from the disability benefits statutes underlying the case and is not targeted to the class and the legal injuries for which it originally brought this lawsuit. The legal services that Plaintiffs and LSC would subsidize with Congress's disability appropriations extend far beyond disability proceedings, and include such matters as housing, employment, family law, and issues with Social Security. Under Plaintiffs' proposal, those present-day legal matters need not be connected in any way to the veteran who originally manifested the service-connected disease: instead, under Plaintiffs' proposal, a veteran's descendant could obtain a lawyer's free help with her own employment case, to pursue a consumer fraud lawsuit, or to contest child support obligations in a family law case. None of these uses are remotely what Congress authorized in its appropriation legislation; nor are they the relief that the parties agreed to more than three decades ago when the case was resolved.

Finally, denying Plaintiffs' requested cy pres award does not mean that the VA gets to keep, and therefore spend, this money for some other purpose. Instead, Congress made clear that its disability benefits appropriation was to remain available until it was expended for the specified purposes, thus ensuring that it would go to compensate veterans for service-connected disabilities. Contrary to Plaintiffs' suggestion, there is no prospect that the VA, or the government generally, will repurpose these funds from compensation benefits to some other competing priority. Of course, the VA has no principled opposition to providing assistance to veterans—indeed, that is the agency's mission—but it cannot do so by ignoring congressional restrictions or through mechanisms it never agreed to in the Consent Decree.

The VA recognizes the possibility—and indeed, the reality—that not every single class member entitled to monetary relief will in fact receive that monetary relief. That is an unfortunate, but to some degree unavoidable outcome of a settlement that is structured to ensure readjudication of decisions that are often decades-old. With a class of this magnitude in a large country, there are significant challenges in locating every class member. And there are numerous reasons why,

*Nehmer v. VA*, **Case No. 3:86-cv-06160-WHA**
Defendant's Opposition to Plaintiffs' Motion for Cy Pres Distribution

even outside the context of this case, a claim for VA benefits might be unresolved or even remain unpaid following adjudication—be it death of the claimant, abandonment of the claim, a household move, or some other factor. For this case, in the past three years alone, the VA has performed over one hundred thousand readjudications of Blue Water Navy and 2021 National Defense Authorization Act presumption claims, and the 1,137 class members Plaintiffs have identified represent well under one percent of that total.[1] And there is always the possibility that some of the class members Plaintiffs have identified *will* step forward to claim their award. The Court should not take preemptive action to inhibit that outcome, and should not substitute Plaintiffs' unilateral preference for how to spend the funds in question for Congress's explicit and limited appropriation. Plaintiffs' Motion should be denied.

## BACKGROUND

Plaintiffs filed this class action in 1986 to challenge a VA regulation promulgated under the Veterans' Dioxin and Radiation Exposure Compensation Standards Act (Dioxin Act). Pub. L. No. 98-542, 98 Stat. 2725 (1984). The Dioxin Act directed the VA to establish a framework for granting disability claims on a presumptive basis for diseases shown to be associated with Agent Orange exposure in Vietnam. The VA's ensuing regulation presumed service-connection only for chloracne. 38 C.F.R. § 3.311a(c) (1986). The Court certified a nationwide class of Vietnam veterans, and their survivors, who were or would become eligible to apply for disability compensation benefits based on exposure to Agent Orange, or who had filed a claim for such benefits that had been denied by the VA. *Nehmer v. U.S. Veterans' Admin.*, 118 F.R.D. 113, 116, 125 (N.D. Cal. 1987). The Court then invalidated the challenged regulation insofar as it provided that no disease other than chloracne was associated with Agent Orange exposure. *See Nehmer v. U.S. Veterans' Admin.*, 712 F. Supp. 1404, 1420 (N.D. Cal. 1989).

---

[1] To be clear, the two cohorts listed represent a fraction of the overall number of *Nehmer* readjudications the VA has completed over the last 33 years.

In 1991, Congress passed the Agent Orange Act of 1991 (AOA), Pub. L. No. 102-4, 105 Stat. 11, which created a presumption of service-connection for three diseases—non-Hodgkin's Lymphoma, soft tissue sarcomas, and chloracne—if manifested by a veteran who "served in the Republic of Vietnam." 38 U.S.C. § 1116. The AOA also directed the VA to determine whether additional diseases "warrant[] a presumption of service-connection by reason of having positive association with exposure to an herbicide agent." *Id.* § 1116(a)(1)(B); *see also id.* § 1116(b)(1).[2] Shortly after Congress passed the AOA, the parties negotiated a detailed Final Stipulation and Order to resolve the merits of Plaintiffs' claims. The Court approved the parties' stipulated agreement in May 1991, and the parties have since referred to it as the "Consent Decree." *See* Declaration of Richard V. Spataro, Ex. 1, ECF No. 460-1; Declaration of Alessandra M. Venuti, Ex. 1, ECF No. 495-1. As this Court has explained, "[t]he purpose of the consent decree was to require, as additional diseases became recognized [by the VA], automatic readjudications by the VA of claims by military personnel who had served 'in the Republic of Vietnam' where those claims had earlier been denied on the ground that the disease in question had not been determined to be service-connected." *Nehmer v. U.S. Dep't of Veterans Affs.*, No. C 86-06160-WHA, 2020 WL 6508529, at *3 (N.D. Cal. Nov. 5, 2020).

Under the terms of the Consent Decree, the automatic readjudications for class members are to be carried out by the VA as part of the agency's general statutory obligation to pay benefits for "disability resulting from personal injury suffered or disease contracted in line of duty, or for aggravation of a preexisting injury suffered or disease contracted in line of duty, in the active military, naval, air, or space service, during a period of war." 38 U.S.C. § 1110. The Consent Decree does not establish a separate administrative process for readjudicating these claims. Rather, the readjudications are carried out in accordance with existing statutes and regulations that apply to veterans in general when they seek VA compensation benefits (unless they are

---

[2] Congress repealed 38 U.S.C. § 1116(b) in 2022 when it passed the Honoring Our PACT Act of 2022. *See* Pub. L. No. 117-168, § 202(d)(1)(A).

expressly displaced by the Consent Decree).  Thus, on an ongoing basis, the VA conducts readjudications as required by the Consent Decree and, where the readjudication results in a favorable outcome for the veteran, pays retroactive benefits.  Those benefits awards are made from funds appropriated by Congress to the Veterans Benefits Administration for the purpose of paying, in relevant part, compensation benefits.  Congress typically makes such an appropriation on an annual basis: the most recent appropriation, for Fiscal Year 2024, was for $161,850,524,000.  *See* Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, div. J, tit. 2, 136 Stat. 4459, 4949; Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. A, tit. 2, 138 Stat. 25, 39.  For Fiscal Year 2025, Congress has appropriated $182,310,515,000.  *See* Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. A, tit. 2, 138 Stat. 25, 39.  When it made its most recent appropriation, Congress made clear that it was "[f]or the payment of compensation benefits to or on behalf of veterans . . . as authorized by section 107 and chapters 11, 13, 18, 51, 53, 55, and 61 of title 38, United States Code."  *Id.*[3]  At no point has Congress made a separate, dedicated appropriation solely for the payment of benefits to *Nehmer* class members, nor did the parties agree that the VA would create such a fund as part of the Consent Decree.

Between 1991 and the present, the VA has issued multiple final rules recognizing numerous diseases as associated with presumed herbicide exposure in Vietnam.  *See* 38 C.F.R. § 3.309(e) (listing diseases).  In the 2021 National Defense Authorization Act, Congress itself identified three new conditions to be presumptively associated with herbicide exposure: bladder cancer, hypothyroidism, and Parkinsonism.  *See* Pub. L. No. 116-283, 134 Stat. 4785.  In May 2021, the Secretary of Veterans Affairs announced that the VA would apply the *Nehmer* Consent Decree to those three new presumptive diseases, *i.e.*, that the agency would automatically

---

[3] *See also* Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, div. J, tit. 2, 136 Stat. 49, 541; Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. J, tit. 2, 134 Stat. 1182, 1665; Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, div. F, tit. 2, 133 Stat. 2534, 2788.

*Nehmer v. VA*, **Case No. 3:86-cv-06160-WHA**
Defendant's Opposition to Plaintiffs' Motion for Cy Pres Distribution

readjudicate the claims of individuals who were denied benefits for one of those three diseases. *See* Press Release, VA plans expansion of benefits for disability claims for conditions related to certain toxic exposure, https://news.va.gov/press-room/va-plans-expansion-of-benefits-for-disability-claims-for-conditions-related-to-certain-toxic-exposures/ (May 27, 2021). To implement the Consent Decree, the VA has automatically readjudicated hundreds of thousands of claims that were based on these diseases and previously denied.

If a readjudication pursuant to the Consent Decree is favorable to the veteran, the VA determines the amount of retroactive benefits owed (with the additional benefit of an earlier effective date for the award) and makes payment of those benefits to the appropriate payee(s). If the veteran is living, the VA pays the full amount to the veteran. Nothing in the Consent Decree, however, sets forth a process by which the VA will distribute payments if the veteran is deceased. Under VA rules that govern ordinary benefits cases, the spouse, child, or dependent parents of a deceased veteran may be eligible to receive payment if they file a claim for those benefits within one year of the veteran's death. *See* 38 U.S.C. § 5121(a)(2). Under the Consent Decree, however, special extra-statutory rules apply.[4]

In April 2003, to resolve a dispute between the parties over whether the estate of a deceased veteran is an eligible payee in the event that no surviving spouse, child, or parent of the veteran could be located, the Court issued an Order directing the VA to make payments of retroactive benefits "to the first individual or entity in existence listed below:"

    (a)    the class member's spouse;
    (b)    the class member's children (if more than one child exists, payment of the retroactive benefits owed shall be divided into equal shares, and accompanied by an explanation of the division);

---

[4] Governing statutes and VA regulations also provide for what happens when "a veteran receiving compensation under [the disability benefits statute] disappears." 38 U.S.C. § 1158; 38 C.F.R. §§ 3.656, 3.158(c). Congress authorized the VA to "pay the compensation otherwise payable to the veteran to such veteran's spouse, children, and parents." 38 U.S.C. § 1158. Nowhere in these rules, however, did Congress authorize payment in the event of a veteran's disappearance to anyone other than those enumerated payees, such as a non-party like LSC here.

(c)    the class member's parents (if both parents are alive, half of the retroactive benefits owed shall be paid to each parent, and accompanies by an explanation of the division);

(d)    the class member's estate

*See* Order Denying Defs.' Mot. For Clarification, 6, ECF No. 324.  In August 2003, the VA promulgated a regulation codifying the Court's Order above and setting forth the same hierarchy of payees for unpaid retroactive benefits in the event a veteran "dies prior to receiving payment." 38 C.F.R. § 3.816(f)(1).

Thus, in the event of a favorable readjudication for a deceased veteran under the Consent Decree, the VA's task is to identify the eligible payees from this list in descending order of priority.  In certain circumstances, the VA is unable to locate any of the payees on the list and, by agreement of the parties, the VA provides those veterans' identifying information to class counsel. Class counsel have then in many cases undertaken to locate payees by retaining an investigation firm and expending additional resources.  In most cases, class counsel and their investigators are able to successfully locate an appropriate payee.  Historically, as part of their annual request for attorney's fees in this case, class counsel have sought reimbursement from the VA for their fees and costs associated with these investigative efforts.  Those fee requests were all settled without resort to litigation.

Plaintiffs' Motion now before the Court concerns the situation when class counsel's efforts, according to counsel, have not yielded an appropriate payee.  According to Plaintiffs, counsel have identified 869 deceased veterans for whom all known individuals on the list of appropriate payees are deceased and no estate for the veteran remains open, and 390 appropriate payees who are not deceased but who nonetheless cannot be located.  Pls.' Mot. for Cy Pres Distribution (Pls.' Mot.) 9-10, ECF No. 525.  The VA accepts for purposes of argument Plaintiffs' estimate that the aggregate amount of retroactive benefits owed to these individuals is $63.1 million; if necessary depending on the outcome, the VA will calculate the actual amount. Plaintiffs seek an order from this Court directing the VA to take the money owed to this group of

class members as compensation benefits, and pay it instead to the Legal Services Corporation so that it can establish and oversee a grant program for legal services. Pls.' Mot. 1.

## ARGUMENT

Plaintiffs' request to transfer the disability compensation benefits owed to *Nehmer* class members to LSC so that it can establish and run a legal aid grants program should be denied. The parties never agreed to a cy pres provision in the Consent Decree, and Plaintiffs should not now be permitted to rewrite the agreement. Further, the settlement in this case is not suitable for a cy pres award because it never involved a traditional settlement fund paid by the defendant. Instead, the VA agreed to specific and special modifications for class members to its existing process under the applicable disability compensation statutes, and to automatically readjudicate class members' claims and, when favorable, give them retroactive effect. The VA never allotted a specific sum of money to pay the class members' claims, and there are therefore no "unclaimed funds" from that sum that can now be transferred to LSC. This case is a far cry from those where cy pres distributions might be appropriate—*i.e.*, when the parties have agreed *ex ante* to a cy pres award or where a court approves a settlement modification proposed by the parties. In this case, by contrast, the Court lacks authority to order a cy pres award over the objections of one party and based solely on the other party's view that funds should be diverted to an entity that was never contemplated by the original agreement.

Ordering a cy pres award to LSC would also violate the Appropriations Clause, by taking money appropriated by Congress for one purpose—payment of disability benefits—and rerouting it to an altogether different purpose—establishing a sui generis legal aid program exclusively for the use of surviving class members and their family members. Congress appropriated the funds that pay class members' benefits awards with the specific directive that the money be used as monetary compensation to veterans for service-connected disability. Congress further provided that those funds are to remain available until expended for that purpose. Granting Plaintiffs' requested relief, on the other hand, would rewrite the appropriations legislation Congress passed.

*Nehmer v. VA*, Case No. 3:86-cv-06160-WHA
Defendant's Opposition to Plaintiffs' Motion for Cy Pres Distribution

This Court should not permit Plaintiffs to wrest away from Congress the policy decision of how to spend appropriated taxpayer funds.

Even if this Court were empowered to order a cy pres award here, the award to LSC does not serve the underlying objectives of either the Consent Decree or the relevant disability benefits statutes. Those statutes are intended to provide compensation for disability incurred in military service, whereas Plaintiffs' proposed grant program would fund lawyers to provide a broad range of legal assistance, including for proceedings that have nothing to do with military service, let alone compensating for disabilities incurred in service. The express terms of Plaintiffs' proposed cy pres award would subsidize relief that is unrelated and untethered to the relief provided by the Consent Decree.

Finally, Plaintiffs are wrong that money would "revert" or "escheat" back to the VA or the government if the Court denies relief. The VA is not permitted to use the appropriated funds for any purpose other than paying veterans' disability benefits, and those funds are, by express congressional directive, to remain available until expended for that purpose, and are therefore not susceptible to recoupment into the Treasury of the United States.

## I. The Consent Decree contains no cy pres provision and no modification provision, and did not result in a settlement fund from which purported unclaimed funds can be distributed.

The 1991 Consent Decree does not contain a cy pres provision. Plaintiffs do not dispute that. Nor does the Consent Decree contain a modification provision. Plaintiffs do not argue otherwise. And finally, the Consent Decree did not result in any damages owed by the VA, or a settlement fund established by the VA to pay class members' claims. Plaintiffs likewise do not dispute this. Under these circumstances, this Court lacks authority to alter the terms of the Consent Decree based on Plaintiffs' unilateral preference that funds appropriated to pay the claims of class members be diverted to a non-party exclusively chosen by Plaintiffs' counsel. At bottom, what Plaintiffs seek is for this Court to add a cy pres provision to the Consent Decree more than 33 years after the parties reached agreement to settle this case. The Court should not do so.

*Nehmer v. VA*, Case No. 3:86-cv-06160-WHA
Defendant's Opposition to Plaintiffs' Motion for Cy Pres Distribution

9

Requiring the VA to pay millions of dollars on an ongoing basis to a non-party chosen by Plaintiffs' counsel would be a wholesale departure from the terms to which the parties agreed. *See* Pls.' Mot. 1 n.1 (describing Plaintiffs' plans to request, in addition to the proposed cy pres award, a "future distribution" as well). And doing so would also extinguish the rights of the very class members the Consent Decree was supposed to benefit by ensuring that the compensation benefits owed to them will instead be paid to the Legal Services Corporation—an entity that was never injured and has never been involved in this litigation.

Initially, the doctrine of cy pres does not apply in this case. Contrary to Plaintiffs' framing in their Motion, there are not residual funds "left over" from some agreed amount previously paid by the VA. Nor did the parties' settlement establish a dedicated monetary fund against which class members would then submit claims, or from which the VA would pay benefits as a result of favorable readjudications. Instead, what the parties agreed to were modifications to how the VA would readjudicate claims for disability benefits under the existing claim-processing rules that applied, and continue to apply, to veterans' disability compensation benefits. *See generally* 38 U.S.C. §§ 1110, 5101, 5110; Pls.' Mot. 5 (acknowledging the "unique, ongoing" nature of the remedy to the class provided by the Consent Decree and describing the readjudication process). Specifically, the VA agreed to perform automatic readjudications for those veterans whose claims were previously denied based on certain then- and later-specified diseases.

As a result, the VA expected that implementing the Consent Decree would lead to changes in its processes for awarding disability compensation to class members under the existing statutory entitlements—and that many readjudications would result in obligations to pay benefits to individual class members. But the VA did not allocate a specific sum of money that would be paid to the *Nehmer* class. Doing so would have required advance knowledge of what future scientific evidence would reveal and what conditions would ultimately become eligible for presumptive service-connection under the process required by 38 U.S.C. § 1116(b), as well as advance knowledge of how many claims would be readjudicated, and readjudicated favorably—

all impossible tasks. Instead, providing the necessary funds to pay class members' favorably readjudicated claims was (and remains) the task of Congress. And, as noted above, Congress has fulfilled that role on a regular basis through annual appropriations. But Congress has not authorized the VA to disburse the funds it appropriates in a manner that is inconsistent with existing statutes under Title 38 of the U.S. Code, none of which create a settlement fund or authorize a cy pres distribution. This is therefore not a case where there are "outstanding funds" that have gone unclaimed from a sum certain the defendant agreed to pay. Pls.' Mot. at 10. Because there are no "settlement funds" here, this case does not fit the model where "the settlement funds are the property of the class," *Klier v. Elf Atochem N. Am.*, 658 F.3d 468, 475 (5th Cir. 2011), and cy pres modifications to the original agreement might thus be appropriate to distribute "leftover" money.

Thus, while cy pres may be "a fine concept when parties *have agreed* that cy pres shall be used if money is left over at the end of a class action settlement," it has no role to play here, where there was neither prior agreement to a non-party cy pres payment, nor any specific sum of money allocated as damages or compensation to the plaintiff class in the first place. *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1312 (9th Cir. 1990) (Fernandez, J., concurring) (emphasis added). As a result, "a *cy pres* distribution to a third party of unclaimed settlement funds" is a mismatch for the central premise of the Consent Decree—that the VA would change its processes for adjudicating class members' disability compensation claims and accord a presumption of service-connectedness to specified diseases. *Klier*, 658 F.3d at 475. It is those changes to the adjudication mechanisms under existing statutory processes—and not the government's allocation of some lump sum amount of money for the class's benefit—to which the parties agreed, and under which they have long operated in implementing the Consent Decree.

Plaintiffs' invocation of the Court's "equitable powers" does not change the analysis, because "judicial use of [equitable doctrines] cannot grant . . . [remedies] that Congress has not authorized." *OPM v. Richmond*, 496 U.S. 414, 414-15 (1990). Indeed, in the two Ninth Circuit

cases on which Plaintiffs rely for the proposition that this Court possesses equitable authority to order a cy pres distribution, *see* Pls.' Mot. 10-11, the parties' settlement agreement or the court's judgment expressly provided for such a payment to a non-party.  *See In re Google Inc. Street View Elec. Commc'ns Litig.*, 21 F.4th 1102, 1109 (9th Cir. 2021) (describing agreement's provision that a remainder of "a $13 million settlement fund," after deducting "attorneys' fees, litigation expenses, [and other costs]," would be distributed to jointly-selected third-parties); *Six Mexican Workers*, 904 F.2d at 1304 (court's post-trial judgment "ordered that any unclaimed funds [from the total damages of $1,846,500] be distributed through a *cy pres* award to the Inter–American Fund for indirect distribution in Mexico").  And in the one decision of this Court cited by Plaintiffs, *In re Wells Fargo Securities Litigation*, there was, unlike here, an existing "settlement fund" paid by the defendant from which a residual amount remained for distribution.  991 F. Supp. 1193, 1194 (N.D. Cal. 1998).

The Ninth Circuit's decision in *Six Mexican Workers* confirms that cy pres is inappropriate here.  In that case the Ninth Circuit explained that "[t]he use of cy pres . . . to distribute unclaimed funds may be considered *only* after a valid judgment for damages has been rendered against the defendant."  904 F.2d at 1307 (emphasis added).  But there is no such judgment for damages entered against the VA—and thus no residual "unclaimed" funds—and cy pres is thus categorically inappropriate under the Ninth Circuit's clearly-stated rule.[5]  In none of the cases Plaintiffs cite for the proposition that this Court has authority to order a cy pres award, *see* Pls.' Mot. 10-11, did a court order such an award in a case, like this one, where there was no fund of

---

[5] Plaintiffs have rightly not contended that VA benefits constitute damages, or that they could be recoverable as damages.  *See, e.g.*, *Pappanikoloaou v. Adm'r of Veterans Admin.*, 762 F.2d 8, 9 (2d Cir. 1985) ("To the extent the complaint seeks damages for the V.A.'s denial of due process in handling his claim, we agree with those circuits that have held that one may not circumvent [38 U.S.C. § 511] by seeking damages on a constitutional claim arising out of a denial of benefits.").

*Nehmer v. VA*, Case No. 3:86-cv-06160-WHA
Defendant's Opposition to Plaintiffs' Motion for Cy Pres Distribution

money dedicated to the class, and where there was no cy pres provision in the parties' settlement agreement.

Notably, Plaintiffs never explain what would happen were this Court to award cy pres relief, and then one of the over 1,100 unlocated class members comes forward and claims the benefits owed to them. If Plaintiffs' Motion were granted, and the benefits owed to as-yet unlocated class members were instead ordered to be paid to non-party LSC as a cy pres award, any class members who were located after such a distribution would be unable to recover from the VA. Their compensation awards would already have been paid to LSC.[6] Plaintiffs neither acknowledge nor grapple with this problem. To the extent that Plaintiffs disagree, and maintain that both LSC *and* presently-unlocated class members who later come forward can be paid, that would be an impermissible attempt to recover twice for the same injury. The VA is aware of no legal principle that would authorize such an extraordinary double expenditure of taxpayer funds.[7]

Importing the trusts doctrine of cy pres to this class action, with the inevitable "specter of judges and outside entities dealing in the distribution and solicitation of settlement money" is an endeavor that the Ninth Circuit has noted "may create the appearance of impropriety," *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1039 (9th Cir. 2011) (citing *S.E.C. v. Bear Sterns*, 626 F. Supp. 2d 402, 415 (S.D.N.Y. 2009)), and another court of appeals judge has called "inherently dubious," *Klier*, 658 F.3d at 480 (Jones, J., concurring). Applying cy pres principles is particularly inappropriate where the parties did not include any provisions allowing for modifications to the

---

[6] This consequence alone should prove an adequate basis to deny the requested relief. *See* Martin H. Redish, Peter Julian & Samantha Zyontz, *Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis*, 62 FLA. L. REV. 617, 645 (2010) (noting that the "use of cy pres also threatens the absent individual claimants' right to due process by judicially revoking their substantive right to compensatory relief").

[7] The rule that permits the VA to recover awards paid in error has no application here, *see* 31 U.S.C. § 3711; 38 C.F.R. §§ 1.910(a), 1.1911a, since Plaintiffs maintain that a payment to LSC is an appropriate and warranted outcome, and not an erroneous one that qualifies as the subject of a debt recovery attempt. Further, such debt recovery efforts impose administrative costs on the VA and also burden the recipient paid in error.

*Nehmer v. VA*, Case No. 3:86-cv-06160-WHA
Defendant's Opposition to Plaintiffs' Motion for Cy Pres Distribution

13

original settlement agreement and where that agreement did not create a conventional settlement fund. *See also Nachshin*, 663 F.3d at 1038 (recognizing that "the *cy pres* doctrine—unbridled by a driving nexus between the plaintiff class and the *cy pres* beneficiaries—poses many nascent dangers to the fairness of the distribution process"); *Mirfasihi* v. *Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004) (explaining that a *cy pres* class-action settlement is "badly misnamed").

## II.    Ordering a cy pres award would circumvent the restrictions imposed by Congress on veterans' disability compensation and violate the Appropriations Clause.

Beyond the basic fact that the Consent Decree in this case does not permit application of the cy pres doctrine, ordering the VA to pay non-party LSC would also contravene the restrictions Congress has placed on disability compensation payments, thereby encroaching on the separation of powers and violating the Appropriations Clause.

It is axiomatic that Congress alone wields the power of the purse. U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law"); The Federalist No. 78 (Alexander Hamilton). The Framers foresaw the importance of leaving public funds in the hands of the most democratically accountable branch of government, assuring that such funds would "be spent according to the letter of difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents *or the individual pleas of litigants*." *Richmond*, 496 U.S. at 427-28 (emphasis added). "Indeed, it would be most anomalous for a judicial order to require a Government official . . . to make an extrastatutory payment of federal funds." *Id.* at 430. Thus, "in the absence of clear Congressional authority, the other branches of government cannot effect payment of Treasury funds." *Speers v. United States*, 38 Fed. Cl. 197, 202 (1997) (citing *Richmond*). To authorize payment of public funds in ways never authorized, or even contemplated, by Congress would contravene this fundamental principle and violate the Appropriations Clause. *Id.*; *Reeside v. Walker*, 52 U.S. 272, 291 (1850); *Keepseagle v. Perdue*, 856 F.3d 1039, 1068 (D.C. Cir. 2017) (Brown, J., dissenting) ("*Cy pres* distribution schemes in class actions against the United States confound judicial power;

reverting us to the time when the King could circumvent the People's representatives through the judiciary."); *see also* Redish et al., *supra* n.6, *Cy Pres Relief and the Pathologies of the Modern Class Action*, 62 FLA. L. REV. at 644-50.

The court-ordered cy pres award to non-party LSC that Plaintiffs' counsel has proposed runs counter to Congress's detailed statutory compensation scheme in three ways. <u>First</u>, no relevant statute authorizes cy pres awards or grants to charities from public funds in class action settlements. *See Reeside*, 52 U.S. at 291 ("However much money may be in the Treasury at any one time, not a dollar of it can be used in the payment of anything not thus previously sanctioned."). In its regular appropriations to the VA for payment of disability benefits, Congress stipulated that funding for compensation be distributed "as authorized by section 107 and chapters 11, 13, 18, 51, 53, 55, and 61 of title 38, United States Code." Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, div. A, tit. 2, 138 Stat. 25, 39. The cited section and chapters are, collectively, the statutes that govern the VA's administration of benefits to eligible beneficiaries. Critically, no provision among those cited statutes mentions the possibility of cy pres awards in class action settlements or contains any authority that would authorize payment to an entity such as LSC that has no relationship to or with the beneficiary. To the contrary, Congress stated with clarity that the appropriations are "to remain available until expended," reflecting an intent that the VA retain the funding so that it could and would be used to pay veterans' compensation in succeeding years. *Id.* Rather than require the VA to fully exhaust these appropriated funds each year, Congress reasonably directed it to retain the money until it was paid out according to the procedures established by statute. *Id.*; 38 U.S.C. § 313(a).

If the express congressional restriction on appropriated funds were not alone sufficient to deny relief, the Ninth Circuit has made clear that cy pres awards cannot modify existing statutory prescriptions. In *Six Mexican Workers*, for example, the Ninth Circuit explained that a cy pres distribution should be denied when it would "subject defendants to greater liability or alter their substantive rights." 904 F.2d at 1307; *see also In re Hotel Tel. Charges*, 500 F.2d 86, 90 (9th Cir.

1974) (denying "fluid recovery" akin to cy pres distribution when to do so would lead to "enlargement or modification of substantive statutory rights by procedural devices"). Diverting funds to non-party LSC would alter the VA's legal obligations by requiring it to pay an individual veteran's disability compensation not to that veteran (or that veteran's survivors in accordance with statutory law or the Consent Decree), but to an entity that is not a party to this case and is not among the intended beneficiaries for the funds Congress appropriated. Moreover, as noted above, it is far from clear whether Plaintiffs' requested cy pres award would, in their view, even relieve the VA of its statutory payment obligations to individual veterans. It is difficult to imagine a scenario that would "subject defendant[] to greater liability" than the prospect of the VA making double payment for a single compensation award. *Six Mexican Workers*, 904 F.2d at 1307. This Court should reject Plaintiffs' invitation for it to rewrite congressional appropriations statutes.[8]

<u>Second</u>, Congress's veterans' disability compensation schemes are intended to compensate individual veterans, not charities or non-profit groups like LSC and its prospective sub-grantees under Plaintiffs' proposal. The relevant provisions of the U.S. Code provide that "the United States will pay [disability compensation benefits] to any *veteran* thus disabled," 38 U.S.C. § 1110 (emphasis added), and define a "veteran" as "a person" *id.* § 101(3); *see also id.* § 1152 (providing that "benefits of this chapter shall . . . be granted to *persons* heretofore recognized by law as having a compensable status" (emphasis added)). Congress never

---

[8] Accepting Plaintiffs' theory would also have serious consequences for other settlements involving federal statutes providing for compensatory benefits. In cases where a federal agency agrees to adjudicate (or readjudicate) claims in a particular manner for a defined class of applicants, but certain applicants—for whatever reason—either do not come forward or cannot be located, Plaintiffs' cy pres theory would have that agency pay any "unclaimed" benefits to a third party. That kind of monetary liability not only is contrary to how the Ninth Circuit treats the cy pres doctrine, *see Six Mexican Workers*, 904 F.2d at 1307; *In re Hotel Tel. Charges*, 500 F.2d at 90, but also could substantially reduce the government's willingness to settle otherwise valid claims, if benefits could end up going not to the deserving beneficiaries but to non-parties that provide services that are, at best, tangentially related to the underlying benefits statute.

authorized funds intended for veterans' compensation to be paid to an organization for further downstream distribution to other organizations as Plaintiffs seek here.

_Third_, Congress pegged the value of compensation owed to individual claimants based on detailed factual determinations of veterans' service-connected injuries. 38 U.S.C. §§ 1110, 1114. For example, if a Vietnam veteran filed a claim of entitlement to VA benefits for Type II diabetes mellitus, that condition would be presumptively service-connected under 38 U.S.C. § 1116(a)(2)(H). VA would then obtain relevant medical records, 38 U.S.C. §§ 5103A(b)(1), (c)(1) (duty to assist statute), analyze those records to determine the veteran's impairment and assign a disability rating in accordance with the facts found, 38 U.S.C. § 1155 (authority to develop a rating schedule); 38 C.F.R. § 4.119 DC 7913 (rating schedule for the endocrine system), and then provide compensation payments to the veteran commensurate with the rates established by Congress, 38 U.S.C. § 1114 (outlining monthly compensation tied to degree of disability).

Plaintiffs' proposed cy pres award would run roughshod over Congress's carefully tailored statutory compensation scheme—first by re-routing funds to a non-party entity, and then by abandoning any pretense of following the detailed disability compensation rules Congress prescribed when those funds are ultimately spent for a class member's benefit. Under Plaintiffs' proposal, there would no longer be _any_ nexus between the benefits ultimately provided and a particular veteran's service-connected injuries. Instead, LSC would take the funds Congress appropriated to compensate disabled veterans and spend them for wholly unrelated purposes, such as helping other veterans obtain a lawyer in a Social Security proceeding or attempting to amend a family member's military discharge paperwork. _See_ Pls.' Mot. 22, Appendix A (proposing free legal services for "class members and surviving family members"). Those endeavors, which hinge on the costs of hiring lawyers or clerical staff, are a far cry from granting benefits based on particular injuries and the rates prescribed in the U.S. Code. To grant Plaintiffs' proposed award

would thus wrest control of the purse away from Congress and its carefully prescribed statutory remedies in favor of an ad hoc and sui generis scheme devised by Plaintiffs' counsel and LSC.

III. **Plaintiffs' proposal that the Legal Services Corporation run a sui generis grants program with funds intended for disability compensation would not further the objectives of the underlying statutes or the Consent Decree.**

Even if a cy pres distribution were otherwise appropriate (which it is not), this Court should reject the particular proposal Plaintiffs have made. As the Ninth Circuit has explained, a proposed cy pres award should be denied when it "fail[s] to (1) address the objectives of the underlying statutes, (2) target the plaintiff class, or (3) provide reasonable certainty that any member will be benefitted." *Nachshin*, 663 F.3d at 1040. Here, Plaintiffs' proposed payment to non-party LSC does not benefit the unlocated class members and does not promote the objectives of the underlying statutes.

According to Plaintiffs' own proposal, the VA would be required to divert funds Congress appropriated for disability compensation to "LSC, for the purpose of making grants to non-profit organizations to perform services for, and at no cost to, surviving veterans and certain family members that are aligned with the interests of the members of the certified plaintiff class in this case." Pls.' Mot. 11-12. LSC and its grantees would then spend that money on an array of legal aid programs, many of which have nothing to do with compensation for service-connected disabilities. For example, congressional funds could be spent to pay a lawyer assisting with "debt collection" or "employment issues" or "divorce." Pls.' Mot. 22, Appendix A.

On their face, many of the goals and purposes Plaintiffs have identified are not related to compensating eligible veterans for the service-connected disabilities they suffered while serving in Vietnam. *See Nachshin*, 663 F.3d at 1038-39 (criticizing courts that "have awarded *cy pres* distributions to myriad charities which, though no doubt pursuing virtuous goals, have little or nothing to do with the purposes of the underlying lawsuit or the class of plaintiffs involved"). Provision of legal aid for ancillary purposes is not an approximation of, let alone a replacement for, monetary compensation for the disabilities incurred by an individual veteran in the course of

*Nehmer v. VA*, **Case No. 3:86-cv-06160-WHA**
Defendant's Opposition to Plaintiffs' Motion for Cy Pres Distribution

his service.  The Court need not delve into legislative history to determine Congress's objective in providing this compensation: 38 U.S.C. § 1155 clearly states that the VA's rating schedule, which is directly tied to the recurring monthly payments a veteran may receive under 38 U.S.C. § 1114, is intended to reflect "reductions in earning capacity from specific injuries or combination of injuries."  To the extent the VA provides other services akin to the ones proposed by Plaintiffs, those services are authorized under separate authority.  *See*, *e.g.*, 38 U.S.C. §§ 4100-4115 (pertaining to job counseling, training, and placement services for veterans).

What is more, the services that LSC and its grantees would fund are not limited to veterans, but could be used by a veteran's spouse, child, or any other "surviving family member."  Pls.' Mot. 22, Appendix A.  It is one thing for monetary compensation for a veteran's disability to be paid to specified next of kin, as Congress has expressly contemplated and authorized, *see* 38 U.S.C. § 5121(a), but quite another for the VA to pay a lawyer to handle a veteran's child's divorce case, to file a lawsuit against her employer, or to prepare her will, all of which Plaintiffs' proposal would allow.  Pls.' Mot. 22-23, Appendix A.  Plaintiffs' proposal would even require the VA to subsidize legal proceedings against another federal agency—*e.g.*, the Social Security Administration or the Department of Health and Human Services.  *Id.* at 22, Appendix A (proposing free legal assistance in social security, Medicare, or Medicaid proceedings).

A court order designed not to remedy injuries suffered by parties before the court, but instead to promote greater access to legal services writ large, would raise serious jurisdictional questions.  Under Article III of the Constitution, a court must "confine[] itself to its constitutionally limited role of adjudicating actual and concrete disputes, the resolutions of which have direct consequences on the parties involved." *United States* v. *Sanchez-Gomez*, 138 S. Ct. 1532, 1537 (2018) (citation omitted).  As potential cy pres recipients, LSC and its prospective grantees under Plaintiffs' proposal are "not parties to the case." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 568 (1992) (plurality opinion).  Thus, to satisfy Article III requirements, the proposed third-party award must have "direct consequences on" the actual class members.

*Sanchez-Gomez*, 138 S. Ct. at 1537 (citation omitted).  Put differently, Plaintiffs here must show that the requested cy pres award makes it "likely, as opposed to merely speculative," that the specific injury to the unlocated class members—unpaid compensation benefits for their service-connected disabilities—"will be redressed."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,* 528 U.S. 167, 181 (2009).  But Plaintiffs' proposal contemplates legal services for entirely new issues that may have arisen, in entirely different proceedings unrelated to the VA disability compensation process, and in many situations have arisen in the independent lives of a different veteran's family members as well.  None of these matters were contemplated by the Consent Decree.

Likewise, the proposed cy pres award would not further the purposes of the Dioxin Act, the Agent Orange Act, or the VA's general disability benefits statutes.  Those enactments, as Plaintiffs themselves put it, were intended "to compensate veterans who were exposed to Agent Orange . . . and their survivors for the injuries and death related to that exposure."  Pls.' Mot. 12.  But Plaintiffs' proposal would re-route the compensation benefits owed to certain class members, transform them into free legal services for purposes unrelated to those disabilities, and give them to *other* class members or their family.  Just because LSC itself has concluded that its services have some value to the class, *see* Pls.' Mot. 14, does not mean this Court must subsidize its operations though a multi-million dollar taxpayer-funded grant.  Moreover, many of the services identified on Plaintiffs' Appendix A are already supported through existing VA programs, to say nothing of what other responsible federal agencies or initiatives support.[9]  And insofar as many

---

[9] For example, Veterans Service Organizations (VSOs) —including class counsel— provide assistance to veterans and their families in preparing, presenting, and prosecuting VA benefits claims, and they do so at no charge to the claimants.  *See* 38 U.S.C. § 5902(b)(1)(A); https://www.va.gov/ogc/apps/accreditation/accredvso.asp (listing the National Veterans Legal Services Program as an accredited VSO).

With respect to housing support, VA runs the Supportive Services for Veteran Families program, which awards grants to private non-profits and consumer co-ops to assist veteran families with housing issues.  *See* Supportive services for Veteran Families, https://www.va.gov/homeless/ssvf/index.html (stating that the VA awarded $798 million in grants

---

*Nehmer v. VA*, Case No. 3:86-cv-06160-WHA
Defendant's Opposition to Plaintiffs' Motion for Cy Pres Distribution

of LSC's intended uses contemplate proceedings *against* the VA or other federal agencies, the government should not be forced to subsidize its own litigation opponents, particularly when Congress has already established claimant representation programs and provides substantial funding to LSC.[10]

Relatedly, while Plaintiffs acknowledge that LSC's legal services will go to class members and next of kin other than the unlocated class members, Plaintiffs recognize elsewhere that this type of outcome is "inequitable." Pls.' Mot. 11 n.8. They flatly oppose a "pro rata distribution of funds to located class members" because those class members "have already benefitted" and awarding them a pro rata share of the purportedly "unclaimed funds" would "not address the needs of other class members." *Id.* That position is irreconcilable with Plaintiffs' own proposal, which would impose no restriction on these same located class members, or their spouses, children, or other family members, receiving free legal services—when they have already received monetary

---

for FY 2025). VA also runs a home loan program where veterans can obtain competitive home loans backed by the VA without requiring a downpayment or private mortgage insurance. *See* VA Home Loans, https://benefits.va.gov/homeloans/. The Servicemembers Civil Relief Act also provides protections related to foreclosures and repossessions. *See* 50 U.S.C. App. §§ 533(c), 534, 537(a)-(b)

And for employment issues, the VA has the Veterans Readiness & Employment program that helps train and educate veterans, provide them with job seeking skills and resources, and work with them on workplace accommodations. *See* Veteran Readiness and Employment, https://www.benefits.va.gov/vocrehab/.

[10] For the past three fiscal years, Congress has provided annual funding to LSC of $560 million (FY2024), $560 million (FY2023), and $489 million (FY2022). LSC's most recent budget request to Congress, for FY2025, seeks $1.797 billion. Funding for LSC has historically been the subject of negotiations between the political branches. For example, for FY2023, LSC sought $1.26 billion, the President requested a funding level of $700 million, and Congress ultimately appropriated $560 million. Providing relief through this litigation that approximates ten percent of LSC's funding could substantially affect those negotiations going forward. A judicial addition to LSC's annual funding would moreover subvert the appropriations process by distorting the political settlement Congress and the Executive reached.

*Nehmer v. VA*, Case No. 3:86-cv-06160-WHA
Defendant's Opposition to Plaintiffs' Motion for Cy Pres Distribution

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

payment for service-connected disability.  The Court should not grant a windfall benefit that Plaintiffs themselves admit would be unfair.  *Id.*

Finally, courts have observed that cy pres awards in the class action context "present a potential conflict of interest between class counsel and their clients."  *In re Baby Prod. Antitrust Litig.*, 708 F.3d 163, 173 (3d Cir. 2013); *see also Mirfasihi*, 356 F.3d at 785 (noting that "class actions are rife with potential conflicts of interest between class counsel and class members"). Plaintiffs' proposed cy pres award to LSC is not immune to that critique.  To be clear, Defendant is not here alleging any actual collusion by class counsel.  Yet, LSC was selected unilaterally by Plaintiffs, without any input from (or even notice to) the VA.  Further still, Plaintiffs' Motion not only asks for funds to be redirected from class members to Plaintiffs' selected entity, but also acknowledges expressly that class counsel could themselves actually receive funds under the proposed grant program.  *See* Pls. Mot. 15 ("[A]fter receipt of a grant, [the proposed cy pres] grantees would not be barred from voluntarily contracting with . . . class counsel or their employers").  Those funds of course belong ultimately to class counsel's clients—the veterans who are members of the class—and should, at a minimum, not be used to remunerate class counsel or other lawyers as they represent individuals who may fall outside the class.  And even assuming that a cy pres award were appropriate here (which it is not), this Court has had no opportunity to consider alternative recipients to LSC or alternative uses to those unilaterally proposed in Appendix A.  As the First Circuit has noted, "having judges decide how to distribute cy pres awards both taxes judicial resources and risks creating the appearance of judicial impropriety."

*In re Lupron Mktg. & Sales Practices Litig.*, 677 F.3d 21, 38 (1st Cir. 2012); *see Nachshin*, 663 F.3d at 1039 (same).

Even if there were some equitable basis to order cy pres relief in this case, Plaintiffs' proposal to transfer public funds allocated to pay veterans' disability compensation to LSC for comprehensive free legal services should be denied.

## IV.    Denying the requested cy pres award would not result in "reversion" to the VA.

Plaintiffs devote considerable space to arguing that the disability benefits awards should not "revert" to the VA or "escheat" to the government.  Pls.' Mot. 16-20.  But Plaintiffs' argument is a non sequitur that proceeds from a false premise—*i.e.*, absent some action by the Court, the VA will "retain" the funds in question and use them for some purpose other than compensating veterans for disability.  Pls.' Mot. 16.  Indeed, the VA is prohibited from doing so.  *See Richmond*, 496 U.S. at 430 ("It is a federal crime, punishable by fine and imprisonment, for any Government officer or employee to knowingly spend money in excess of that appropriated by Congress.") (citing 31 U.S.C. §§ 1341, 1350).  First, Congress made clear that its appropriations for disability compensation benefits are to "remain available until expended."  Pub. L. No. 118-42, div. A, tit. 2, 138 Stat. 25, 39; 38 U.S.C. § 313(a) ("Funds appropriated to the [VA] may remain available until expended.").  That restriction deflates Plaintiffs' contention that denying relief would "benefit"—or result in a "profit" to—the VA.  Pls.' Mot. 16-20.  At bottom, Plaintiffs' implicit argument that this Court must act to prevent the VA from spending the funds on some other priority is misplaced.  Second, there is no requirement that the VA at some point repay the appropriated funds to the General Treasury, and Plaintiffs cite none.  Plaintiffs' notion that there exists a prospect of escheat to the government is therefore just as erroneous.[11]

Denying Plaintiffs' requested cy pres award would not benefit the Department.  Instead, it would benefit any class members who come forward to claim their awards by ensuring they are

---

[11] Plaintiffs' citation to 28 U.S.C. §§ 2041 and 2042, *see* Pls.' Mot. 20, confirms their misunderstanding.  Those provisions apply only where there are "moneys paid into any court of

*Nehmer v. VA*, Case No. 3:86-cv-06160-WHA
Defendant's Opposition to Plaintiffs' Motion for Cy Pres Distribution

23

not transferred elsewhere.   It would also benefit future veteran claimants by ensuring adequate resources to provide the full compensation they are entitled to.  And it would benefit taxpayers as a whole by preventing the redirection of their public funds to a purpose Congress did not envision, let alone approve.  *See Richmond*, 496 U.S. at 430 ("If an executive officer on his own initiative had decided that, in fairness, respondent should receive benefits despite the statutory bar, the official would risk prosecution. That respondent now seeks a court order to effect the same result serves to highlight the weakness and novelty of his claim.").

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be denied.

Dated:  September 17, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY R. FARBY
Assistant Director

By:  _____*/s/ M. Andrew Zee*_____
M. ANDREW ZEE (CA Bar #272510)
Department of Justice, Civil Division
Federal Programs Branch

*Attorneys for Defendant*

---

the United States, or received by the officers thereof."  28 U.S.C. § 2041; *id.* § 2042 (addressing "money deposited under section 2041 of this title").  But the VA has not in this case deposited money with this Court, as the VA has already explained above.  Instead, it pays class members directly upon a favorable readjudication outcome under the Consent Decree.

*Nehmer v. VA*, **Case No. 3:86-cv-06160-WHA**
Defendant's Opposition to Plaintiffs' Motion for Cy Pres Distribution